ST. JOSEPH FARMS OF INDIANA BROTHERS OF THE
CONGREGATION OF HOLY CROSS, SOUTHWEST PROVINCE,
INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 27830–81.      Filed July 1, 1985.

*David T. Link,* for the petitioner.
*Elsie Hall,* for the respondent.

JACOBS, *Judge*: Respondent determined the following deficiencies in petitioner's income tax:

| TYE June 30— | Deficiency |
| --- | --- |
| 1977 | $857 |
| 1978 | 7,522 |
| 1979 | 18,836 |

The issues for decision are: (1) Whether the farming operations conducted by petitioner (an organization exempt from income tax pursuant to section 501[1]) during the years 1977, 1978, and 1979 constitute the conduct of an unrelated trade or

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue.

business within the meaning of section 513, and (2) if the farming operations constitute an unrelated trade or business, whether substantially all of the work in carrying on the trade or business was performed without compensation.

FINDINGS OF FACT

This case has been submitted for decision under Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and accompanying exhibits are so found and are incorporated herein by this reference.

Petitioner St. Joseph Farms of Indiana Brothers of the Congregation of the Holy Cross, Southwest Province, Inc., was incorporated under the Indiana General Not-For-Profit Corporation Act, Ind. Code Ann. sec. 23–7–1.1–1 et seq. (Burns 1972), on July 22, 1965. Petitioner is exempt from taxation as a member of the U.S. Catholic Conference, which has been granted a group exemption under section 501(c)(3) as a religious organization. Where an organization is granted a group exemption, the articles of incorporation of each subordinate organization are not separately examined.

The Congregation of the Holy Cross was founded in France during the troubled period following the French Revolution, and was permanently established in the United States in 1841.[2] Until 1955, the Holy Cross Brothers had only one province in this country. In 1955, the U.S. province was divided into three separate provinces: (1) The Southwest Province, (2) the Midwest Province, and (3) the Eastern Province. Although geographically petitioner falls within the Midwest Province, it was given to the Southwest Province in order to provide that province with a source of income.

The original purchase of the land for petitioner was made in 1867. Since that date, the Holy Cross Brothers have operated St. Joseph Farms. Within the last 15 to 20 years, St. Joseph Farms was expanded through the acquisition of a section of land known as St. Bernard's Farm.

In 1956, the appraised value of St. Joseph Farms was approximately $721,000. As is true for many other commercial farming operations that have been in existence for an extend-

---

[2]In 1842, Rev. Edward F. Sorin and six Brothers of the Holy Cross opened a boarding school near South Bend, Indiana. This school was to become the University of Notre Dame.

ed period of time, the farm has appreciated substantially in value over the years.

At present, petitioner's farm operation consists of approximately 1600 acres of land. Of this total acreage, approximately 1300 acres are planted in corn, wheat, and soybeans. Additionally, there is a feedlot for approximately 500 beef cattle.

Besides several outbuildings which are used as storage sheds for equipment, a machine shop, and shelter for the cattle, the physical plant includes corn-drying facilities and several large storage silos.

There are two houses on the property. One house contains a chapel, offices, living quarters, kitchen, dining area, and a recreation room for the Brothers, and the other house contains an office, library, and recreation room, and additional living quarters.

Petitioner owns all of its own farm equipment. Petitioner's equipment includes three large, four-wheel drive, enclosed-cab tractors; four smaller tractors; a combine; a semi-tractor with three different trailers; a crane used for digging ditches; and an assortment of plowing, seeding, and fertilizing equipment. In addition, petitioner owns several cars and smaller trucks.

Some of the corn raised by petitioner is used for cattle feed. The remaining corn and soybeans, wheat, and cattle are marketed from a study of market trends, which are followed on a daily basis with quotes from the Chicago Board of Trade and the Mercantile Exchange by way of radio broadcast and the Wall Street Journal. Other factors that are figured into the marketing of petitioner's products are how soon a commodity needs to be moved, and transportation costs to the market. In addition, the farm manager maintains close contact with area farmers and agricultural experts in the marketing of grain and livestock. Long-range forecasts are reviewed through farm magazines.

In taxable years ended June 30, 1978, and June 30, 1979, petitioner participated in certain farm price support programs administered by the Agricultural Stabilization and Conservation Service of the U.S. Department of Agriculture. These programs provide certain benefits (i.e., land diversion payments, commodity loans, target price protection, and certain authorized disaster payments) to farmers who plant one or more program crops (wheat, corn, grain sorghum, barley, or

oats) and participate in and comply with the acreage reduction and land diversion program. Petitioner's participation in these programs resulted in its receipt of subsidies of $10,605 for fiscal year 1978 and $11,253 for fiscal year 1979. Petitioner's stated reason for participating in the programs is as follows:

The Internal Revenue Service has asked for an explanation of St. Joseph Farms' participation in government sponsored farm programs such as the Payment-In-Kind (PIK) presumably because such participation would appear to be motivated by maximizing the profits for the farms. These government programs are set up as an essential part of supporting farm prices across the nation thus insuring the survival of a substantial number of marginal farming operations. If St. Joseph Farms did not participate they would be acting in defiance of this governmental purpose. They could not maintain any credibility among neighboring families or the regional farming community if they refused to participate in these programs. As the director of St. Joseph Farms stated, "There is no way I would have planted fence row to fence row in 1983. There is a human dimension here. I would not want to be guilty of driving young kids away from the farms."

Membership and directorship in petitioner are limited to the Brothers of the Holy Cross that are assigned to the farm by the Provincial Superior of the Southwest Province. A Brother's assignment to any type of work or to a particular location is determined by the Provincial Superior and may be changed at any time. The authority of the director of the farm or of any other provincial endeavor is subject to that of the Provincial Superior. Budgets for all of the works of the province, including the farm, must be approved by the Provincial Superior and his council. In addition, the Provincial Superior and his council must approve certain policies. The director of the farm can make day-to-day decisions with respect to the operation of the farm without reference to the Provincial Superior, provided that those decisions do not impinge upon the budgetary and financial control reserved to the Provincial Superior and his council. Any profit realized by petitioner in a given year is forwarded to the Southwest Province the following year unless the funds are needed to make acquisitions of equipment which have been duly authorized.

The Brothers of the Holy Cross take a vow of poverty which is described in the Statutes of the Proceedings of the General Chapter of 1975 of the Congregation of Holy Cross as follows:

In making his vow of poverty, the religious acknowledges that all income accruing from his work, even supererogatory work, gifts occasioned by his services or by his priestly or religious character, and gifts meant to provide for his personal needs, belong to the congregation (can. 580,2; 594,2).

As for property which comes to the religious after his first commitment, he must cede the administration of it in conformity with statute 17 (can. 569,2). Inheritances, legacies and gifts which are intended by their very nature or by the donor to constitute or increase the patrimony of the religious are presumed to be personal; the authorization of the local superior or director is required to accept or renounce such an inheritance or legacy. As for gifts, this permission is required only for their acceptance.

No superior may permit a religious to use his personal property for himself since it is exclusively from the common funds that provision is to be made for the needs of all (can. 594,1).

Before his perpetual profession, a religious must make a will that meets the requirements of civil law and covers all the property he already owns or may later acquire (can. 569,3). Before first commitment, he must cede for the entire period of his commitment the administration of his property to whom he wishes, determine how it is to be used, and dispose of its income in favor of some charitable work or in favor of anyone he wishes except himself, unless he wishes to add it to his patrimony (can. 569,1). These acts of cession and disposition must be made in instruments having binding force before the civil law, with the stipulation that they are revocable.

Any change in these arrangements or in his will requires the permission of the superior general, or of the provincial if he has been so delegated (CA 17). To dispose of his property in view of some consideration, or to change his will in an urgent case when it is not possible to have recourse to a higher superior (can. 583,2), as well as for all acts required by civil law, the permission of the local superior or director of the residence suffices.

At the time of his admission to the novitiate, the candidate must sign a legal document stating that he renounces all right to receive compensation for himself or his family for the time passed in the congregation, for services rendered or for any other benefit which the congregation may have been able to gain from him.

After advising the provincial, a religious who is perpetually professed may renounce all or part of his patrimony (PC 13; NPC 24). This must be done in conformity with civil law. If the renunciation is made in favor of the congregation, the contract of renunciation must include provisions by which the property will be restored, on presentation of a written request, in case he should leave the congregation for any reason whatever.

No salaries are actually paid to the Brothers, despite the terminology used in petitioner's financial reports and returns. Household expenses and each Brother's personal expenses are totaled, and then this figure is allocated to either the farm or cattle operation under the heading of "salary" on petitioner's financial reports and returns. The allocation is based on the total time each Brother spends with either operation. In

addition, petitioner is assessed $1,650 each year for each brother by the Southwest Province. The assessment is reported as "Charge for Member Serv."

The Brothers who reside on the farm receive food, clothing, shelter, and medical care, regardless of whether they are involved in farm operations or other work of the religious community. The South-West Province has elected under the FICA regulations[3] to make FICA payments for the Brothers at the farm based upon average living expenses. Petitioner's explanation for the Brothers' participation in FICA is as follows:

> The Brothers of Holy Cross participate in Social Security because such participation was made available to them by a special provision allowing coverage of members of a religious order who are under a vow of poverty. The history of F.I.C.A. Sec. 3121(r) makes it clear that Congress was allowing coverage of those who do not get personal compensation for their labor. In fact, the Regulations Sec. 31.3121(i)–4 set up a fictional "wage" and compute the contribution for all Brothers at the same amount no matter what the work of each Brother (including Brothers who are going to school instead of working).

The Brothers' daily schedule at the farm is as follows:

| | |
|---|---|
| 5:00 a.m. | Rising |
| 5:30 a.m. | Morning prayer followed by common meditation |
| 6:00 a.m. | Liturgy—celebration of Mass |
| 6:45 a.m. | Breakfast |
| 7:30 a.m. | Work begins |
| 11:30 a.m. | Work ends/prepare for dinner/visit to chapel |
| 12:00 p.m. | Dinner |
| 12:45 p.m. | Work résumés |
| 5:00 p.m. | Work ends/prepare for supper/visit to chapel |
| 6:00 p.m. | Supper |
| 6:30 p.m. | Evening prayer and private devotions |

At various times during the year, this schedule is modified to accommodate seasonal changes and the observance of religious holidays.

Between 12 and 14 of the Brothers engaged in the operation of the farm. These brothers provide approximately 91 percent of the full-time labor and perform approximately 94 percent of

---

[3]Sec. 3121(r); 26 C.F.R. sec. 31.3121(r)–1 (1984).

the total hours worked. The balance of the labor required to run the farm is provided by part-time outside help.

A priest, who is a member of the priests' society of the Holy Cross, lives with the Brothers on the farm and serves as chaplain. The chaplain performs sacerdotal functions such as celebrating Mass and administering the sacraments. He receives a check for $900 for each 6-month period. The actual charge is $1,450 every 6 months, but $550 is deducted for room and board.

Apart from the farming activity, the Brothers often provide counseling on individual spiritual problems, matters of personal faith, and troubled family situations. They do not maintain office hours but are generally available to those seeking counseling. In response to a questionnaire[4] circulated among the neighboring community and inquiring as to the benefits to the community that have resulted from the presence of St. Joseph Farms and the Holy Cross Brothers, the following responses were received:

A. From my own personal experience, when I was younger one of the Brothers taught me religious classes. I then received my sacraments, Holy Communion and Confession.

B. They have the respect of anyone and everyone that knows the operation. Truly a guiding light to a true Christian way of life. Anyone knowing their operation and ways has had his life enriched.

C. Through my visits and contacts with the Brothers my wife (a convert) and I have had our religion reinforced by the fellowship and examples of charity and love put forth by the Brothers.

D. Personally we are Hindus by religion. We learn more about Christianity and Christians whenever we visit the Brothers at St. Joseph Farms; the more we associate with them, the more we like and respect Christianity and Christians.

E. Religiously I, and also my family, by joining the Brothers at prayer both at mealtimes and chapel, have come to understand more the community of man and also to learn first-hand about the Brothers of Holy Cross.

F. When our family has had major medical problems the Brothers at St. Joseph's Farm have always helped us with their words and prayers. We have joined them in Mass and prayer in their chapel and are always welcome. They have given us gifts of handsome rosaries which our whole family use.

G. It has always been spiritually uplifting to witness the Brothers and the Holy Cross Community at work among the people of St. Joseph County. The fact that the Brothers are working primarily out of a religious motivation

---

[4]The questionnaire responses were included in Joint Exhibit 26-Z, which consists of the "Anticipated Testimony of Brother Patrick Sopher, Provincial Superior of the South-West Province." No objection has been raised as to hearsay with respect to this exhibit.

rather than financial has to be a powerful force in arranging one's own priorities. It is extremely important to have this *source* of highest motivation at work among the people each day. [Emphasis in original.]

H. The willingness of the Brothers to lend a helping hand to someone in time of need. The Brothers have shown spiritual support when tragedy strikes a neighbor, such as visiting the ill in hospitals on a consistent basis. Also inviting people who are alone to share a holiday with them. They have sponsored neighborhood gatherings for various occasions. When there is a death in the family, the Brothers had special prayers for us.

I. By their acts of Faith, Hope and Charity they are an inspiration to the community.

J. The warm and generous feeling from all of the very fine men at the farm has served as an example to us in our everyday endeavors. The religious atmosphere, ever present, is a thing, we have observed, many imitate.

K. THEY SHOW A VERY GOOD EXAMPLE OF LIVING A GOOD LIFE. They give food to eat to a few old lonely men from this area who had no one to share important holidays with. A close neighbor of ours has been in the hospital a month and now in a nursing home over a month with a very serious stroke. Many times when we had gone to see our mutual friend, some of the Brothers were there to try to comfort and cheer him. AND IT CERTAINLY HELPED. [Emphasis in the original.]

L. The Brothers of Holy Cross or St. Joseph Farm are always ready to help a neighbor anytime day or night seven days a week. Just give them a call ph 272-0962. Someone will always answer.

M. People in our community are influenced just by the mere religious atmosphere of the St. Joseph Farm. The Brothers are willing to counsel members of our community in problems dealing with family relationships, religious beliefs, as well as any other area in which people are finding it difficult to solve their problems.

N. They've always been ready and willing to help me in any way. They never would take any pay either. I cannot tell all the ways they've helped.

O. I feel that the lifestyle of the Brothers at St. Joseph Farm is a spiritual example to the community. I personally am able to attend mass at St. Joseph Farm especially during Lent when I can't find a Mass elsewhere at the right time. Also, I have always felt free to speak with some of the Brothers about my own personal spiritual needs and thoughts.

There are a total of 167 professed Brothers in the Southwest Province. The numbers of candidates entering the novitiate each year for the last 10 years are as follows:

| 1973 | 1974 | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 |
|------|------|------|------|------|------|------|------|------|------|
| 5 | 0 | 1 | 2 | 0 | 3 | 4 | 1 | 4 | 4 |

The Southwest Province pays income taxes for those Brothers of the Province who work for organizations which are not exempt from tax under section 501(c)(3).

Not all of the units of the Southwest Province are self-sustaining. Regular financial subsidies are made to several apostolic works in which the Brothers are engaged.

OPINION

Respondent determined that petitioner's farming activity constitutes an unrelated trade or business within the meaning of section 513 and, therefore, determined deficiencies in petitioner's income tax, for taxable years ended June 30, 1977, June 30, 1978, and June 30, 1979, under section 511. Petitioner contests respondent's determination on the following three alternative grounds: (1) The farming activity does not constitute a trade or business within the meaning of section 513; (2) even if the activity is deemed to be a trade or business, the activity was substantially related to petitioner's exempt purposes and therefore does not constitute an unrelated trade or business under section 513; and (3) because substantially all of the farm work was performed without compensation, petitioner's farming activity is not an unrelated trade or business under the exception provided in section 513(a)(1).

Section 511[5] imposes a tax on the unrelated business taxable

---

[5]SEC. 511. IMPOSITION OF TAX ON UNRELATED BUSINESS INCOME OF CHARITABLE, ETC., ORGANIZATIONS.

(a) CHARITABLE, ETC., ORGANIZATIONS TAXABLE AT CORPORATION RATES.—

(1) IMPOSITION OF TAX.—There is hereby imposed for each taxable year on the unrelated business taxable income (as defined in section 512) of every organization described in paragraph (2) a tax computed as provided in section 11. In making such computation for purposes of this section, the term "taxable income" as used in section 11 shall be read as "unrelated business taxable income.".

(2) ORGANIZATIONS SUBJECT TO TAX.—

(A) ORGANIZATIONS DESCRIBED IN SECTIONS 401(a) AND 501(c).—The tax imposed by paragraph (1) shall apply in the case of any organization (other than a trust described in subsection (b) or an organization described in section 501(c)(1)) which is exempt, except as provided in this part or part II (relating to private foundations), from taxation under this subtitle by reason of section 501(a).

(B) STATE COLLEGES AND UNIVERSITIES.—The tax imposed by paragraph (1) shall apply in the case of any college or university which is an agency or instrumentality of any government or any political subdivision thereof, or which is owned or operated by a government or any political subdivision thereof, or by any agency or instrumentality of one or more governments or political subdivisions. Such tax shall also apply in the case of any corporation wholly owned by one or more such colleges or universities.

(b) TAX ON CHARITABLE, ETC., TRUSTS.—

(1) IMPOSITION OF TAX.—There is hereby imposed for each taxable year on the unrelated business taxable income of every trust described in paragraph (2) a tax computed as provided in section 1(e). In making such computation for purposes of this section, the term "taxable income" as used in section 1 shall be read as "unrelated business taxable income" as defined in section 512.

(2) CHARITABLE, ETC., TRUSTS SUBJECT TO TAX.—The tax imposed by paragraph (1) shall apply

income of State colleges and universities and of organizations otherwise exempt from tax under section 401(a) and 501(c). Sec. 511(a). "Unrelated business taxable income" is defined by section 512(a)(1) to mean "gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business."

Section 513(a) defines an "unrelated business trade or business" as follows:

SEC. 513(a). GENERAL RULE.—The term "unrelated trade or business" means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance of such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 (or, in the case of an organization described in section 511(a)(2)(B), to the exercise or performance of any purpose or function described in section 501(c)(3)), except that such term does not include any trade or business—

(1) in which substantially all of the work in carrying on such trade or business is performed for the organization without compensation; or

(2) which is carried on, in the case of an organization described in section 501(c)(3) or in the case of a college or university described in section 511(a)(2)(B), by the organization primarily for the convenience of its members, students, patients, officers, or employees, or, in the case of a

---

in the case of any trust which is exempt, except as provided in this part or part II (relating to private foundations), from taxation under this subtitle by reason of section 501(a) and which, if it were not for such exemption, would be subject to subchapter J (sec. 641 and following, relating to estates, trusts, beneficiaries, and decedents).

(c) SPECIAL RULE FOR SECTION 501(c)(2) CORPORATIONS.—If a corporation described in section 501(c)(2)—

(1) pays any amount of its net income for a taxable year to an organization exempt from taxation under section 501(a) (or which would pay such an amount but for the fact that the expenses of collecting its income exceed its income), and

(2) such corporation and such organization file a consolidated return for the taxable year, such corporation shall be treated, for purposes of the tax imposed by subsection (a), as being organized and operated for the same purposes as such organization, in addition to the purposes described in section 501(c)(2).

(d) TAX PREFERENCES.—

(1) ORGANIZATIONS TAXABLE AT CORPORATE RATES.—If an organization is subject to tax on unrelated business taxable income pursuant to subsection (a), the tax imposed by section 56 shall apply to such organizations with respect to items of tax preference which enter into the computation of unrelated business taxable income in the same manner as section 56 applies to corporations.

(2) ORGANIZATIONS TAXABLE AS TRUSTS.—If an organization is subject to tax on unrelated business taxable income pursuant to subsection (b), the taxes imposed by section 55 and section 56 (as the case may be) shall apply to such organization with respect to items of tax preference which enter into the computation of unrelated business taxable income.

local association of employees described in section 501(c)(4) organized before May 27, 1969, which is the selling by the organization of items of work-related clothes and equipment and items normally sold through vending machines, through food dispensing facilities, or by snack bars, for the convenience of its members at their usual places of employment; or

(3) which is the selling of merchandise, substantially all of which has been received by the organization as gifts or contributions.

Section 513(c) provides that "the term 'trade or business' includes any activity which is carried on for the production of income from the sale of goods or the performance of services," and further that "an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization."

The regulations promulgated under section 513 provide the following gloss on the definition of a "trade or business:"

(b) *Trade or business.* The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete. On the other hand, where an activity does not possess the characteristics of a trade or business within the meaning of section 162, such as when an organization sends out low-cost articles incidental to the solicitation of charitable contributions, the unrelated business income tax does not apply since the organization is not in competition with taxable organizations. However, in general, any activity of a section 511 organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax. Accordingly, for purposes of section 513 the term "trade or business" has the same meaning it has in section 162, and generally includes any activity carried on for the production of income from the sale of goods or performance of services. Thus, the term "trade or business" in section 513 is not limited to integrated aggregates of assets, activities and good will which comprise businesses for the purposes of certain other provisions of the Internal Revenue Code. Activities of producing or distributing goods or performing services from which a particular amount of gross income is derived do not lose identity as trade or business merely because they are carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Thus, for example, the regular sale of pharmaceutical supplies to the general public by a hospital pharmacy does

*not lose identity as trade or business* merely because the pharmacy also furnishes supplies to the hospital and patients of the hospital in accordance with its exempt purposes or in compliance with the terms of section 513(a)(2). Similarly, activities of soliciting, selling, and publishing commercial advertising do not lose identity as a trade or business even though the advertising is published in an exempt organization periodical which contains editorial matter related to the exempt purposes of the organization. However, where an activity carried on for the production of income constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit. [Sec. 1.513–1(b), Income Tax Regs.]

Petitioner's first argument is that the touchstone for determining whether an activity constitutes a trade or business under section 162 is whether the activity was engaged in with a predominant profit motive (*Hirsch v. Commissioner*, 315 F.2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *Professional Insurance Agents of Michigan v. Commissioner*, 78 T.C. 246, 262 (1982), affd. 726 F.2d 1097 (6th Cir. 1984)), and that, because petitioner's farming activity is not primarily profit-motivated, the activity does not constitute a trade or business. The question of whether the requisite profit motive exists in any given case is one of fact that is resolved in light of all the facts and circumstances. E.g., *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981).

In support of its contention that the farm is not operated primarily for profit, petitioner cites various operational practices (such as delayed replacement of equipment; failure to use maximum automation; the failure to expand the farm or to borrow money; and loans of equipment, facilities, and the Brothers' time to neighboring farms) and petitioner's accounting practices (failure to use accelerated depreciation or to claim investment tax credits) as "inconsistent with maximizing profits." While petitioner does admit to "some profit motivation" on the part of the Brothers who operate the farm, it maintains that "Any profit motive is clearly subordinate to the primary purpose of farming as the best and perhaps only effective vehicle for conducting an apostolate among farmers."

We do not accept petitioner's argument. In our view, petitioner's analysis goes astray by equating a profit motive with a profit-maximizing motive. The mere fact that a trade or business may not be run as efficiently as possible does not negate the activity's status for tax purposes as a trade or

business. The question of whether an activity is conducted primarily for profit requires an evaluation of whether the profit motive predominates over any other motive for engaging in a particular activity (such as personal enjoyment or advancing an exempt purpose). Despite petitioner's assertions that it primarily engaged in farming as a vehicle for advancing its religious, educational, and charitable purposes, we think that the record before us is to the contrary.

To begin with, petitioner has stipulated that the reason that it was given to the Southwest Province in 1955, when the Congregation of the Holy Cross divided the U.S. province into three separate provinces, was to provide the Southwest Province with a source of income. In addition, petitioner, as noted above, concedes that a profit motive does play a role in the operation of the farm.

Petitioner's contention that St. Joseph Farms is operated like a family farm rather than a commercial farm poses, in our view, a distinction without a difference since both a family farm and a commercial farm are for-profit activities. Indeed, we think the record shows that petitioner's operation of St. Joseph Farms is indistinguishable from the operation of any other for-profit farm. The scale of petitioner's operations, the marketing of the farm products, and petitioner's participation in Government-sponsored farm subsidy programs are all factors militating toward the conclusion that the farm was operated for profit. This conclusion is bolstered by the further facts that the Brothers charged with the farming operation performed their duties on a full-time basis, and that assistance to the community (such as the free advice and use of equipment) was done on an informal, ad hoc basis.[6] The law is quite clear that "an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization." Sec. 513(c); sec. 1.513–1(b), Income Tax Regs.

---

[6]Petitioner, on brief, contends that the farm operation served an educational purpose. The record, however, is barren of any suggestion that petitioner conducted any agricultural education programs. We fail to find any support in the record for the contention that the farm served as an educational model, and we note that none of the written responses to the community survey attest to the fact that any neighboring farmer has improved his farming methods as a result of his acquaintance with petitioner's farming operations.

Having decided that petitioner's farming operation constituted a trade or business, we turn to the next step in the analysis: whether the trade or business was unrelated to petitioner's exempt purposes. The regulations describe the type of relationship required to take an activity out of the "unrelated" category as follows:

Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. Where the production or distribution of the goods or the performance of the services does not contribute importantly to the accomplishment of the exempt purposes of an organization, the income from the sale of the goods or the performance of the services does not derive from the conduct of related trade or business. Whether activities productive of gross income contribute importantly to the accomplishment of any purpose for which an organization is granted exemption depends in each case upon the facts and circumstances involved. [Sec. 1.513–1(d)(2), Income Tax Regs.]

Petitioner contends that the requisite substantial relationship is satisfied in this case, because the operation of the farm provides the setting for its mission of conducting an apostolate within a farming community and establishes credibility for the members of the order within that community. Indeed, petitioner maintains that the Brothers operate a farm for the same reason that they operate schools, boys' homes, and foreign mission facilities, and that the farm would not be operated were it not for the farming apostolate. Through farming, petitioner argues, petitioner propagates moral principles, and the Brothers' "overall lifestyle" teaches moral values to those with whom the Brothers come in contact. As evidence of this assertion, petitioner points to the community survey.

Respondent maintains, and we agree, that there is nothing particularly unique about farming that can "contribute importantly" to the Brothers' religious outreach mission. We think petitioner's equation of the farming operation with its operation of schools, boys' homes, and foreign mission facilities is

inaccurate. Clearly, the latter activities fall within the category of what have traditionally been considered, in and of themselves, charitable activities. Farming, on the other hand, does not fall within that category.

While the community survey attests to the fact that the Brothers' "overall lifestyle" teaches moral values to those with whom the Brothers have come in contact, there is nothing in the survey or elsewhere in the record to support a conclusion that there is a substantial relationship between the farming "lifestyle" chosen by the Brothers and the propagation of moral values. We have no doubt that a survey taken in a community in which the Brothers are engaged in any other endeavor would evoke similar responses. Nothing in the survey, as we view it, establishes the requisite nexus between farming and moral teaching.

Petitioner has adduced no evidence to support its assertion that the operation of the farm is *the best or most effective method* for providing both a forum and credibility for the Brothers within the farming community. To adopt this argument, without any proof thereof, would, as respondent points out, imply that a religious group could carry on virtually any business and claim that it was carrying on an apostolic mission to others engaged in that business. Thus, we conclude that petitioner's farming activity is an unrelated trade or business.

The final issue to be determined is whether petitioner fits within the exception to the definition of an unrelated trade or business set forth in section 513(a)(1). Section 513(a)(1) provides that the term "unrelated trade or business" does not include any trade or business "in which substantially all the work in carrying on such trade or business is performed for the organization without compensation." See sec. 1.513–1(e), Income Tax Regs.

In *Waco Lodge No. 166, Benevolent & Protective Order of Elks v. Commissioner*, T.C. Memo. 1981–546, affd. per curiam 696 F.2d 372 (5th Cir. 1983), this Court held that the bingo games operated by an exempt organization did not fall within section 513(a)(1) where 23.1 percent of the work was performed for cash compensation and the balance of the work was performed by "volunteers" who received free drinks for their services. In affirming this Court's opinion, the Fifth Circuit held that, although the free drinks did not constitute compen-

sation to the volunteers for the purposes of the statute, the 23.1 percent of the work performed for cash compensation was substantial enough to disqualify the bingo game operation from the benefit of the exception.

There is no dispute herein as to the facts that approximately 94 percent of the total hours worked in operating the farm and 91 percent of the labor is supplied by the Brothers and that the balance is provided by paid outside workers. Respondent argues, however, that the food, clothing, shelter, and medical care received by the Brothers who operate the farm should be treated as compensation within the meaning of section 513(a)(1). As support for this characterization, respondent relies upon the election by the Southwest Province under section 3121(r) to make FICA payments for the Brothers and upon the characterization of the Brothers' living expenses as "salary" on petitioner's financial statement. We do not agree.

While compensation is unquestionably a broad concept (*Smith-Dodd Businessman's Association, Inc. v. Commissioner*, 65 T.C. 620, 624 (1975)), and embraces non-cash remuneration (e.g., *Commissioner v. LoBue*, 351 U.S. 243 (1956)), we think that a critical element of the concept is that there must be a "but-for" connection between the payment and the services. All of the Holy Cross Brothers, who are under a vow of poverty, are provided with necessities by the Order, without regard to the Brother's particular assignment among the Province's works. Brothers who are disabled, elderly, or attending school receive the same support as those Brothers who are assigned to operating the farm. If St. Joseph Farms were to cease operations tomorrow, we have no doubt that the Brothers who have been operating the farm would receive the same support allowance. This is simply not a case where, but for the rendering of services, the payment would not have been made. We conclude that the support provided those Brothers who operate the farm does not constitute compensation, at least for the purposes of section 513(a)(1), and therefore hold that the exception provided in that provision applies to petitioner's farming activity.

Accordingly,

*Decision will be entered for the petitioner.*