SHILOH YOUTH REVIVAL CENTERS, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4223-84.          Filed March 12, 1987.

*Meade Emory* and *Pitman B. Potter*, for the petitioner.
*Larry N. Johnson*, for the respondent.

COHEN, *Judge*: Respondent determined deficiencies in
petitioner's income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1977 | $413,171 |
| 1978 | 317,460 |

After concessions, the issues for decision are: (1) Whether
certain activities conducted by petitioner (an organization
exempt from income tax pursuant to section 501)[1] consti-
tute the conduct of unrelated trades or businesses within
the meaning of section 513 and, if so, (2) whether substan-
tially all of the work in carrying on the trades or businesses
was performed without compensation.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the facts set
forth in the stipulation are incorporated in our findings by
this reference.

In the late 1960's and early 1970's, a fundamentalist
Christian revival known as the "Jesus Movement" emerged

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of
1954 as amended and in effect during the years in issue.

from southern California and swept throughout the United States. Shiloh Youth Revival Centers (petitioner) is one of the largest and best known of the groups that coalesced during the "Jesus Movement." Petitioner is a tax-exempt religious organization. Its headquarters and principal offices are located on a large tract of heavily forested land near Eugene, Oregon. Its objectives, as stated in its articles of incorporation, are as follows:

(1) To proclaim the Good News of Jesus Christ.

(2) To educate people in the Word of God.

(3) To encourage people to assume a responsible position in society through education and personal counseling.

(4) To counsel and reconcile families.

(5) To rehabilitate drug users.

(6) To encourage young people to complete their education.

(7) To establish places of worship or centers to be known as Shiloh Youth Revival Centers.

(8) To operate a Bible School at 81868 Lost Valley Lane, Dexter, Oregon.

(9) To carry on and conduct legitimate business activity in order to provide income for the operations of the corporation itself. To do any and all things necessary, suitable, convenient or proper for, and in connection with or incidental to, the carrying on or conducting of such business or businesses, or interests of the corporation, or to enhance the value of its property, and in general to do any and all things and exercise any and all powers which it may now or hereafter be lawful for the corporation to do, or to exercise the laws of the State of Oregon that may now or hereafter be applicable to the corporation.

As petitioner grew in the early 1970's, teams of its evangelists left Oregon to establish centers (also termed "houses") in cities across the United States. Petitioner grew rapidly. During the years in issue, as many as 78 houses accommodated over 1,000 members in 20 States, the Virgin Islands, and Canada. Many new members were attracted by a communal lifestyle based on fundamentalist Christian beliefs. Religious worship permeated all aspects of this lifestyle. Petitioner's members prayed, worshipped, and evangelized as they worked in petitioner's business activities.

Petitioner's houses provided young "street people" with three meals and a place to sleep. These young visitors were identified as "guests." After a few days at one of the houses, a "guest" would be asked to "accept Christ." If he

or she did so, the "guest" was invited to remain at the house as a "lamb." During the first several weeks after joining, a new member was not required to and did not work in petitioner's businesses. "Lambs" who had been with petitioner for 3 months were identified as "90-day lambs" and were given limited staff responsibilities. "Ninety-day" lambs also received a monthly personal allotment, as well as medical and dental care.

After a period of approximately 3 months, petitioner's "lambs" would be eligible for admission to the Bible school at petitioner's Study Center in Oregon. "Lambs" who had abandoned their former way of life and accepted petitioner's doctrines were generally admitted to the school. The school's program consisted of 2 months of "Bible survey" followed by 4 months of "Bible analysis." As a condition of remaining a member of petitioner, students had to demonstrate that they were willing to work in petitioner's businesses. Students participated in group work "stewardships" during the course of their Bible school training. Stewardship groups were assigned various tasks, chores, and duties essential to the maintenance and operation of the Study Center.

Petitioner assigned Bible school graduates to staff positions at one of its centers or in one of its administrative or evangelical departments. Petitioner's staff offered personal counseling to petitioner's members and managed petitioner's business activities. The business-related duties of petitioner's staff included:

(1) locating work opportunities or employment;

(2) preparing bids or negotiating contracts;

(3) ordering supplies and equipment necessary to perform the work under contract;

(4) arranging for members or other individuals to perform work under contract;

(5) arranging for transportation of workers or employees to and from the job sites;

(6) arranging for or attending to the maintenance and repair of business vehicles and equipment;

(7) preparation of budgets and other projections or estimates of revenue and costs;

(8) collection of income for the work performed;

(9) recordkeeping and bookkeeping for business activities;

(10) preparation of statistics, compilations, financial reports and statements, and tax returns;

(11) payment of business expenses;

(12) determination and payment of salaries, wages, and other benefits to workers or employees;

(13) supervision of the workers in their performance of the labor involved;

(14) obtaining licenses and permits, filing necessary reports, and otherwise complying with local, state, and federal laws and regulations with respect to carrying on such businesses;

(15) overall management and supervision of all aspects of business operations and finance.

Many staff members were also required to work full time in order to earn income for the support of petitioner, its members, and the houses for which they were responsible.

Of the members who were drug users upon joining petitioner, almost all had discontinued drug usage within a few days or weeks of joining. All members had completely discontinued drug usage by the time they entered the Bible school at petitioner's Study Center. One of the conditions established by petitioner for admission into the Bible school was that the member be rehabilitated from his or her former pattern of life. Although petitioner considered a new member to be rehabilitated as a "drug addict" by the time of entry into Bible school, it did not consider a new member to be fully rehabilitated at that time and believed it was possible for Bible school graduates to "backslide" and resume drug use. If a new member was caught using drugs after joining one of petitioner's houses, he was expelled from the house and petitioner's program. The member could reenter petitioner's program only if he or she "repented."

As an essential component of its doctrine, petitioner espoused a communal, collective approach which emphasized the role of teams in all activities (including prayer and work). In its early history, petitioner had organized its members into work teams for berry picking, bean picking, canning of fruits and vegetables, construction work, apple picking, tree planting, tree pruning, cooking and dishwashing, house cleaning, painting, and an activity known as "chicken picking," which consisted of gathering chickens from their roost and loading them onto a truck for transport to a slaughter house. Petitioner emphasized group

labor because individual members working in outside employment had been placed under great pressure to renounce their new found beliefs. Group labor was thus a vehicle for religious training and mutual reinforcement, as well as a vehicle for earning money to support the group.

By 1977 and 1978, the use of large work teams for such income-producing activities had been largely discontinued. Petitioner had initially placed a heavy emphasis on growing its own food. As a result, petitioner's agricultural holdings and activities had expanded rapidly, providing many opportunities for group labor. Petitioner soon recognized, however, that it was more profitable to furnish workers to outside businesses than it was to operate its own farms. By 1977, petitioner's emphasis on group labor had diminished and its members had found employment in small, service-oriented businesses that generally did not provide opportunities for work in large teams.

The work performed by petitioner's members in petitioner's forestry, cleaning and maintenance, painting, and "donated labor" activities was conducted under the auspices of petitioner's centers in the "house ministry." Payments for the work performed in petitioner's businesses were made directly to petitioner by the person for whom the work was done.

Petitioner's forestry crews planted trees pursuant to contracts between petitioner and various timber companies. During the course of petitioner's forestry activities, a supervising staff member of petitioner engaged in personal and religious counseling during the course of work and during lunch breaks and rest periods. The managers of petitioner's forestry business attempted to promote greater productivity and efficiency through tough negotiation of contracts and better internal controls over business operations. Although some of petitioner's members were former drug and alcohol abusers, petitioner's forestry business was otherwise similar to the activities of its commercial competitors.

During the years in question, petitioner hired a very small number of nonmembers (termed "outsiders" or "unbelievers") to round out its forestry work crews. Former members also worked in petitioner's forestry business. Petitioner

maintained at least one partial crew of former members in Eugene and used former members as foremen for other crews made up from its membership. Forestry was the only business in which petitioner hired nonmembers to work.

Petitioner's cleaning and maintenance workers performed various janitorial and household cleaning and maintenance tasks pursuant to contracts between petitioner and various private individuals. Most cleaning and maintenance activities were performed by individual members of petitioner. All of the work in petitioner's cleaning and maintenance activities was conducted exclusively by petitioner's members. Members of petitioner's staff offered personal and religious counseling during the course of work and during lunch breaks and rest periods.

Petitioner's painting crews painted houses and other structures pursuant to contracts between petitioner and various property owners. All of the work of petitioner's painting activities was conducted exclusively by petitioner's members. Members of petitioner's staff offered personal and religious counseling during the course of work and during lunch breaks and rest periods.

The term "donated labor" as used by the parties and in this opinion refers to labor or services performed by petitioner's members for a private individual or entity unrelated to petitioner. Petitioner negotiated contracts in which it agreed to provide its members' services to unrelated private employers. Members who engaged in "donated labor" activities signed an agreement, called a wage donation agreement, in which they indicated that they were donating their wages to petitioner. Employers paid members' wages directly to petitioner. The income earned in these "donated labor" activities constitutes the gross income of petitioner's "donated labor" business. Petitioner's staff members occasionally obtained supervisory jobs and offered counseling to petitioner's members working at the same job site.

In 1977, in an effort to more effectively manage and control its expanding business activities, petitioner initiated a program in which it required its houses to prepare regular statistical reports on its financial, business, and income-producing activities. Petitioner's business office staff com-

piled and summarized these reports in petitioner's "Labor Management Journal." These reports and summaries allowed petitioner to monitor each house's success in efficiently operating its business activities; monitoring full employment for its members; meeting its revenue goals and budgets; and obtaining group labor. Petitioner determined which houses to retain and which to eliminate based, in part, on their ability to achieve these goals and also, in part, on their ability to attract new members.

One of petitioner's primary goals was to maintain full employment for its members through promotion and expansion of its profitable businesses. Because of pressure placed on the houses to maintain full employment and to meet established revenue goals, petitioner's members often could not be selective about the type of jobs they obtained. During 1977 and 1978, petitioner and its members actively sought out and secured many unskilled jobs that did not involve group labor.

Virtually all of petitioner's members worked. Prior to 1977, petitioner considered evangelism such an important purpose that those members who demonstrated a special skill for evangelism were given an "evangelist license" and were required to devote all their time and energy to evangelism while being free of any obligation to contribute financially to their own support or the support of petitioner. As a consequence of petitioner's mounting financial problems, a new policy was established in January 1977 requiring the evangelists to work part time in petitioner's businesses to contribute to their own support and to fully cover the costs of petitioner's evangelistic mission. In July 1977, petitioner's program of licensed evangelists was completely eliminated and former evangelists were returned to work full time in petitioner's businesses.

Even members who were considered "nonrevenue persons"—persons who never worked in petitioner's businesses for income—in fact performed services essential to the successful operation of its businesses. "Nonrevenue persons" acted as full-time housecooks, kitchen help, vehicle drivers, errand people, laundry workers, house managers, house stewards, builders, or maintenance persons. Full-time students at the Bible School were also classified as

"nonrevenue persons." The only "nonrevenue persons" who did not work for or in support of the businesses were a small number of handicapped persons unable to work or perform other necessary duties in the houses.

Petitioner's members were entirely dependent upon petitioner for support and subsistence for long periods of time. For most members, membership in petitioner became a complete lifestyle. Petitioner provided them with jobs, support, and numerous monetary and nonmonetary benefits. Members participated in petitioner's business activities in expectation of petitioner's support. The monetary and nonmonetary benefits petitioner provided to its members included the following:

(1) Food, clothing, and shelter were provided to all members.

(2) Medical care and dental care were provided to all members, with the level of dental care contingent on the length of time as a member of petitioner.

(3) Subject to financial constraints, monthly monetary payments in the form of personal allotments or salary were paid to all of petitioner's members who had been with petitioner at least 90 days with the amount of salary or allotment contingent, in part, on the level of responsibility of the position held and, in part, on need.

(4) Regular monthly salaries paid to former members working on petitioner's staff who were married, no longer living communally, and part of petitioner's fellowship, with the amount of salary contingent, in part, on the level of responsibility of the position held.

(5) A new member's outstanding debts and obligations incurred prior to joining petitioner were assumed and paid by petitioner.

(6) Salary, allotments, and payroll increases were made for increases in the cost of living, or other expenses, subject to availability of funds.

(7) Death benefits and disability aid were paid to members.

(8) Petitioner adopted a vacation policy for its members permitting members to take time off from their jobs with petitioner for a yearly vacation lasting from 7 to 12 days (with extra days allowed for travel time and good job attendance), plus a vacation allotment of at least $100 to $200.

(9) Grants and aid were provided to members to continue their education.

(10) Members were paid severance pay when they were laid off their jobs or were leaving petitioner to move into the community.

(11) Members who were to be married were allowed to retain up to 60 days of earnings from their work in petitioner's businesses for use for paying for their marriage while living in a house.

(12) Members were given time off and not required to work (essentially given sick leave) if they were temporarily ill or injured.

These monetary and nonmonetary benefits represented a substantial portion of the petitioner's total yearly expenditures. Petitioner's actual cash or monetary payments to members represented a substantial portion of the total economic benefits received by members.

In late 1977, petitioner's leaders discovered that petitioner was potentially liable for the Federal income tax on unrelated business income. Petitioner's leaders became concerned with this issue when: (1) Coopers and Lybrand gave a qualified opinion in petitioner's 1976 audit report, and (2) respondent published Rev. Rul. 76-341, 1976-2 C.B. 307, in response to facts submitted by petitioner in a ruling request that was later withdrawn. A formal statement of petitioner's "work philosophy" was developed in an attempt to strengthen petitioner's position on this issue. Petitioner's formal work philosophy was included in petitioner's bylaws as follows:

We believe that a church or charity should become involved with the whole man, including the spiritual, mental, physical, emotional and economical facets of man. Work fulfills this purpose for us by:

1. Providing initial rehabilitation by teaching honesty and giving (Ephesians 4:28);

2. Teaching evangelists in training how to pay their own way so as to preach the gospel for free (I Thessalonians 2:9 and II Corinthians 9:18);

3. Training in skills and work attitudes;

4. Offering a means of worshiping God, as our labors are conceived as being for Christ;

5. Providing a vehicle of fellowship through the sense of community that is developed in working together. This is an aid in establishing each new believer through a total Christian environment.

The purpose of this environment is to help remold the whole man— spirit, soul, body, emotions, hope[,] ambitions—into the image of Christ. Because a "church" to us is not a building, but those called out from the world as defined in the Bible, the church travels and goes with us to work. For us work is an inseparable part of these functions because we believe and base our lives on the *Bible* which commands us to work. I Thessalonians 4:11-12.

Petitioner's Unrelated Business Taxable Income Committee referred to the work philosophy as petitioner's "initial retaliation" to any IRS inquiry and called for efforts to communicate the philosophy to petitioner's members.

Petitioner reported 1977 gross income of $3,004,059 and 1978 gross income of $1,993,614. Respondent determined

that a significant amount of this income had been generated by unrelated trades or businesses subject to the tax imposed by section 511, et seq. The parties have stipulated that the notice of deficiency reflected petitioner's gross income with respect to these activities as follows:

| Activity | Gross income 1977 | Gross income 1978 |
| --- | --- | --- |
| Cleaning and maintenance business | $301,469 | $404,229 |
| Forestry business | 492,320 | 310,074 |
| Painting business | 0 | 25,983 |
| "Donated labor" businesses | [1]638,628 | 129,154 |

[1]Respondent concedes that the correct amount of gross income from petitioner's "donated labor" business is $628,611.

## OPINION

Petitioner is an organization exempt from tax pursuant to section 501(c)(3). Section 511 imposes a tax on the "unrelated business taxable income" (UBI) of such organizations. Section 512(a)(1) defines UBI as "the gross income derived by an organization from any unrelated trade or business * * * regularly carried on by it," less allowable deductions. "Unrelated trade or business" is defined as:

any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of * * * [the] purpose or function constituting the basis for its exemption. * * * [Sec. 513(a).]

Petitioner's income from forestry, cleaning and maintenance, painting, and "donated labor" will therefore be taxable if (1) such activities constituted trades or businesses, (2) the trades or businesses were regularly carried on, and (3) the conduct of the trades or businesses was not substantially related to petitioner's tax-exempt purpose. Sec. 1.513-1(a), Income Tax Regs.; *United States v. American Bar Endowment*, 477 U.S. 105 (1986); *United States v. American College of Physicians*, 475 U.S. 834 (1986); *Florida Trucking Association, Inc. v. Commissioner*, 87 T.C. 1039 (1986); *Fraternal Order of Police Illinois State Troopers Lodge No. 41 v. Commissioner*, 87 T.C. 747 (1986).

Petitioner concedes that the activities in issue were regularly carried on as trades or businesses. Petitioner

maintains, however, that the conduct of these trades or businesses was substantially related to its tax-exempt purposes.

The Commissioner's regulations provide that the conduct of an exempt organization's business activities must have a "causal relationship" with the achievement of its exempt purpose. Sec. 1.513-1(d)(2), Income Tax Regs. A trade or business is "substantially related" only if the causal relationship is a substantial one. Sec. 1.513-1(d)(2), Income Tax Regs.

for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the *production or distribution* of the goods or the *performance* of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. * * * [Sec. 1.513-1(d)(2), Income Tax Regs. Emphasis supplied.]

The regulation, like the statute, thus emphasizes the *conduct* of the organization's businesses; any other "causal relationship" between the business and the achievement of the organization's exempt purpose is insufficient.

The Supreme Court recently addressed this aspect of the tax on unrelated business income in *United States v. American College of Physicians, supra.* In that case, the Commissioner determined that advertisements placed in the taxpayer's medical journal generated income subject to the tax. The Claims Court focused on the commercial character of the taxpayer's advertising business and upheld the Commissioner's determination. *American College of Physicians v. United States*, 3 Cl. Ct. 531 (1983). The Court of Appeals for the Federal Circuit reversed. *American College of Physicians v. United States*, 743 F.2d 1570 (Fed. Cir. 1984). The appellate court noted that the informational content of the advertisements benefited physicians, and it concluded that the taxpayer's business was thus substantially related to its educational purpose.

The Supreme Court observed that "the statute provides that a tax will be imposed on 'any trade or business the *conduct* of which is not substantially related' [to the organization's exempt purpose] * * * , directing our focus to the manner in which the tax-exempt organization operates its business." *United States v. American College of*

*Physicians*, 475 U.S. at 848-849 (57 AFTR 2d 86-1182 at 86-1188, 86-1 USTC par. 9339 at 83,714). Emphasis in original, citation omitted. The Court analyzed the facts which led the Claims Court to conclude that the taxpayer's operation of its business was not substantially related to its exempt purpose, and it held that the Court of Appeals had erred when it focused on the results of the taxpayer's conduct, instead of on the conduct, itself. The Supreme Court thus concluded that the Claims Court had properly applied the "stringent standards erected by Congress and the Treasury" when it focused on the taxpayer's conduct instead of on the benefits enjoyed by the journal's subscribers. *United States v. American College of Physicians*, 475 U.S. at 849-850 (57 AFTR 2d 86-1182, at 86-1188 - 86-1189, 86-1 USTC par. 9339, at 83,714).

The Supreme Court also observed that the Commissioner had looked to the conduct of the organization, itself, inquiring, among other things, whether the taxpayer "performed the advertising services in a manner that evinces an intention to use the advertisements for the purpose of contributing to the educational value of the journal." *United States v. American College of Physicians*, 475 U.S. at 848 (57 AFTR 2d, at 86-1188, 86-1 USTC par. 9339, at 83,714). Petitioner seizes upon the word "intention" and suggests that it must prevail if we are persuaded that its businesses were *intended* to further its exempt purposes. We disagree. In its analysis, the Supreme Court emphasized the facts which led it to conclude that the taxpayer's *operation* of its business was not related to its exempt purpose. The language regarding intention was used in holding that the Claims Court was correct to concentrate its scrutiny upon the conduct of the organization rather than upon the educational quality of the advertisements. We have examined petitioner's conduct of its businesses and conclude that, as in *United States v. American College of Physicians*, *supra*, the exempt functions of its activities were incidental to raising revenue.

### Petitioner's Exempt Purposes

In reaching our conclusion, we have considered whether the *manner* in which petitioner operated its businesses was

substantially related to the exercise or performance of its exempt purposes, i.e., whether the conduct of the businesses had a substantial causal relationship with the achievement of petitioner's exempt purposes. Petitioner's purposes are stated in its articles of incorporation. Although petitioner was granted an exemption under section 501(c)(3) as a "religious" organization, it applied for a "charitable" as well as a "religious" exemption and claims to have both features. We have not limited our analysis to purposes that are strictly "religious." Although petitioner's articles of incorporation state a number of purposes that may be within petitioner's exemption, the parties have directed our attention to four of petitioner's goals: (1) Rehabilitation of drug users; (2) religious training; (3) religious worship; and (4) evangelism.

Petitioner maintains that its formal "work philosophy" is evidence of its emphasis on supervised group labor as a means of achieving these goals. Although petitioner's "work philosophy" expresses beliefs deeply held by each of petitioner's members, petitioner's *attitude* toward work does not prove that petitioner *conducted* its business in a manner substantially or causally related to its exempt purposes.

Petitioner must prove that the beliefs expressed in its "work philosophy" were applied in practice. It has not. In December 1976, petitioner's Pastors' Council met to address petitioner's mounting financial and organizational problems. The council developed a statement of petitioner's goals. This statement, which was included in the interim report of petitioner's Unrelated Business Income Committee, identified two major goals as providing for the physical needs of members and raising revenue. The report stated that petitioner should meet these goals by creating a job referral program, by creating new businesses, by expanding existing businesses, by maintaining full employment, and by instructing pastors to quickly find better paying jobs for petitioner's members. Nowhere in this statement of goals and objectives does the report identify the development of group labor as one of petitioner's purposes. Financial survival, not group labor, was petitioner's primary concern.

Petitioner's members accepted virtually all types of unskilled jobs. In selecting work activities, petitioner's primary concern was the production of income and the maintenance of full employment. Moreover, examination of petitioner's "Labor Management Journal" demonstrates that it was new members—"lambs"—who engaged in job hunting in order to support petitioner's centers. Many employers of individual members appear week after week in petitioner's Labor Management Journal; it is apparent that most of these jobs were not temporary measures intended to support a house until group labor opportunities were located. Although petitioner argues that work activities were selected specifically in order to provide opportunities for group labor under the supervision of petitioner's staff, the record does not support this assertion.

It appears from the evidence that petitioner's formal "work philosophy" was, in fact, developed in an attempt to strengthen petitioner's defense against imposition of the UBI tax. The work philosophy is simply evidence of petitioner's desire to reduce its tax burden.

*Rehabilitation*

Petitioner has expended considerable effort in its attempt to prove that members were rehabilitated by participation in its businesses. Petitioner's expert witnesses testified at length about the value of work as a vehicle for the rehabilitation of drug users. We may, of course, embrace or reject expert testimony, whichever, in our best judgment, is appropriate. *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938). Although work may "rehabilitate" young "street people" who otherwise might find no productive place in society, there was nothing particularly unique about petitioner's operation of its businesses. Petitioner's staff members negotiated contracts, employed attorneys, and maintained detailed financial records. The actual work performed by petitioner's members was indistinguishable from the work performed by any person engaged in forestry, cleaning and maintenance, painting, or the wide variety of unskilled jobs represented by the term "donated labor." Petitioner has adduced no evidence demonstrating that the *manner in which its businesses were conducted* contributed to the

rehabilitation of its members. Personal counseling provided by petitioner's staff was incidental to petitioner's operation of its communal businesses. Thus we are not persuaded that the *conduct* of the businesses had a substantial causal relationship to rehabilitation.

*Religious Training, Worship, and Evangelism*

Petitioner also maintains that participation in its businesses provided its members with opportunities for religious training, worship, and evangelism. Undoubtedly it did. Petitioner's staff members carried pocket Bibles and exhorted petitioner's members with quotations from the Scriptures. When working in groups, petitioner's members often prayed and sang before, during, and after work. Petitioner's members spoke to everyone they met about their faith and about the lifestyle offered by petitioner; many members were first exposed to petitioner's doctrines by their co-workers.

We do not, however, find that the *conduct* of petitioner's business was substantially related to its purposes of religious training, worship, and evangelism. In *St. Joseph's Farms of Indiana v. Commissioner*, 85 T.C. 9 (1985), the taxpayer, a Catholic Order of Brothers, contended that its operation of a farm was substantially related to its exempt religious purpose because farming was an effective vehicle for conducting an apostolate among farmers. We observed that:

> [The taxpayer] * * * has adduced no evidence to support its assertion that the operation of the farm is *the best or most effective method* for providing both a forum and credibility for the Brothers within the farming community. To adopt this argument, without any proof thereof, would, as respondent points out, imply that a religious group could carry on virtually any business and claim that it was carrying on an apostolic mission to others engaged in that business. * * * [85 T.C. at 23. Emphasis in original.]

We concluded that the taxpayer's farming activity was an unrelated trade or business. As in *St. Joseph's Farms*, petitioner has not shown that forestry, cleaning and maintenance, painting, and "donated labor" were the *best and most effective* vehicles for the achievement of its religious objectives. We are not persuaded that, apart from its

member's constant references to Scriptures and frequent attempts to convert co-workers, petitioner conducted its businesses in a manner any different from that of its commercial competitors. Petitioner's members planted trees, cleaned homes, painted houses, and washed dishes. All evidence in the record strongly suggests that religion permeated every aspect of these and other activities. Although petitioner's members managed to integrate religious training, worship, and evangelism into each and every activity in which they engaged, petitioner cannot avoid the UBI tax merely by showing that its businesses were thus related to its religious objectives. It must show that its activities were peculiarly suited to the accomplishment of its objectives. See *St. Joseph's Farms v. Commissioner*, 85 T.C. at 23. It has failed to do so.

*Section 513(a)(1)*

Petitioner also maintains that it is within an exception to the definition of "unrelated trade or business" set forth in section 513(a). Section 513(a)(1) provides that the term "unrelated trade or business" does not encompass any trade or business "in which substantially all the work in carrying on such trade or business is performed for the organization without compensation."

In *St. Joseph's Farms of Indiana v. Commissioner, supra,* we held that a critical element of "compensation" is the existence of a "but-for" connection between payment and services rendered. 85 T.C. at 24. Respondent would have us abandon this construction of the term "compensation" and hold that businesses are operated by uncompensated labor only if they are staffed by "volunteers," i.e., individuals who not only work without expectation of payment, but who also receive their support from sources outside the exempt organization. We decline to do so. Nevertheless, we conclude that petitioner's members did not work without "compensation" as we construed that term in *St. Joseph's Farms.*

We have observed that compensation is unquestionably a broad concept that embraces noncash remuneration. *St. Joseph's Farms of Indiana v. Commissioner*, 85 T.C. at 24; see *Smith-Dodd Businessman's Association, Inc. v. Commis-*

*sioner*, 65 T.C. 620, 624 (1975). Petitioner provided its members with numerous monetary and nonmonetary benefits. Petitioner assumed and paid new member's debts and obligations. Petitioner paid regular allotments or salaries to all members who had been with petitioner for at least 90 days and increased these allotments or salaries as necessary to compensate for increases in the cost of living. Members also received vacation allotments, bonuses, severance pay, and other monetary benefits. Petitioner provided all members with food, clothing, shelter, and medical care. Petitioner was, in short, a communal organization which provided for all of its member's needs.

Petitioner's members worked in petitioner's businesses in exchange for these benefits. A "guest" could remain at a house only if he or she had "accepted Christ." Careful examination of the entire record convinces us that a "guest" could "accept Christ," and thus join petitioner, only by adhering to petitioner's doctrines. These doctrines provided that there is no separation between religious and secular areas of life; petitioner's members thus believed that God commanded them to work. We conclude that nonmembers could not become members and receive the benefits offered by petitioner without displaying at least a willingness to work. Given petitioner's readiness to expel members who "back slide" into their former way of life by using drugs, we also conclude that petitioner would not have tolerated members who refused to work.

Our conclusion is strengthened by the nature of petitioner's organization. Petitioner could provide for the needs of its members only if virtually all of its members worked. In this respect, petitioner is distinguishable from the taxpayer in *St. Joseph's Farms*. In *St. Joseph's Farms*, only 12 to 14 of the taxpayer's 167 members worked in the taxpayer's unrelated business. The taxpayer demonstrated that its members received food, clothing, shelter, and medical care even if they were not involved in its farming operations. We concluded that "If St. Joseph's Farms were to cease operations tomorrow, we have no doubt that the Brothers who have been operating the farm would receive the same support allowance." *St. Joseph's Farms of Indiana v. Commissioner*, 85 T.C. at 24. In this case, were petitioner's

businesses to cease operations tomorrow, petitioner would soon cease to exist. Simple necessity thus dictated adherence to petitioner's "work philosophy."

Petitioner's leaders were mindful of this reality. The recommendations of petitioner's Unrelated Business Taxable Income Committee, the creation of the Labor Management Journal, and the deliberations of petitioner's Pastor's Council are evidence of petitioner's emphasis on full employment. Petitioner's critical need for full member participation in its communal businesses is also revealed by the curtailment, then abolition, of its evangelist program. Even "nonrevenue persons" provided support services vital to the operation of its businesses. Staff members not directly employed in petitioner's businesses provided vital managerial and administrative services.

Although petitioner's exempt purposes include rehabilitation, religious training, worship, and evangelism, we believe that petitioner's true "purpose" was to provide for the material as well as the spiritual needs of its members. Petitioner was simply the entity through which more than 1,000 people pooled their efforts and resources. Member benefits thus represented a substantial portion of its total yearly expenditures. Were petitioner to dissolve, its members would lose their entire means of support. Petitioner's members were completely dependent upon petitioner for even the most basic necessities of life. All thus worked so that all might eat. Petitioner's members, who performed virtually all of the work incident to the operation of its communal businesses, were well compensated for their labors. Income derived from petitioner's businesses is therefore taxable.

We have not addressed each argument advanced by the parties. Respondent, for example, maintains that petitioner's businesses pose a risk of the unfair competition that section 511, et seq., was designed to prevent. See *United States v. American College of Physicians*, 475 U.S. 834 (1986). Because the parties agree that petitioner's activities constitute trades or businesses, potential unfair competition is not dispositive of the issues for decision. *Professional Insurance Agents of Michigan v. Commissioner*, 78 T.C. 246, 263-264 (1982), affd. 726 F.2d 1097 (6th Cir. 1984);

*Smith-Dodd Businessman's Association, Inc. v. Commissioner*, 65 T.C. 620, 624 (1975); sec. 1.513-1(b), Income Tax Regs. Other arguments advanced by the parties are also unnecessary to our resolution of the issues presented, or are unpersuasive.

To reflect the concessions of the parties,

*Decision will be entered under Rule 155.*