VETERANS OF FOREIGN WARS, DEPARTMENT OF MICHIGAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1010-81.　　Filed July 2, 1987.

*William C. Fried*, for the petitioner.
*Joel V. Williamson*, for the respondent.

CHABOT, *Judge*: Respondent determined deficiencies in Federal unrelated business income tax (sec. 511[1] et seq.) against petitioner as follows:

| Taxable year [2] | Amount |
|---|---|
| 1975 | $6,157 |
| 1976 | 7,351 |
| 1977 | 7,317 |

After concessions by respondent, the issue for decision is whether certain amounts received by petitioner constitute unrelated business taxable income.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner's principal place of business was in Lansing, Michigan.

The Veterans of Foreign Wars of the United States (hereinafter sometimes referred to as the VFW) dates back to the closing days of the Spanish-American War in 1899.[3] The VFW was chartered by an act of Congress on May 28, 1936. Its national headquarters is in Kansas City, Missouri. The VFW's congressional charter and its constitution state that

---

[1] Unless indicated otherwise, all subtitle and section references are to subtitles and sections of the Internal Revenue Code of 1954 as in effect for the years in issue.

[2] Unless indicated otherwise, all references to taxable years are to petitioner's fiscal year ending June 30.

[3] Although the Spanish-American war ended with the Treaty of Paris, which was signed on Dec. 10, 1898, that treaty was not ratified by the U.S. Senate until Feb. 6, 1899. T.S. 343, 30 Stat. 1754. Columbia Encyclopedia 1865 (2d ed. 1950).

its purposes are fraternal, patriotic, historical, and educational. The VFW's congressional charter and its constitution state that it will preserve and strengthen comradeship among its members; assist worthy comrades; perpetuate the memory and history of our dead, and assist their widows and orphans; maintain true allegiance to the Government of the United States of America and fidelity to its Constitution and laws; foster true patriotism; maintain and extend the institutions of American freedom; and preserve and defend the United States from all her enemies. Among the functions performed by the VFW are the aid and assistance of veterans and their dependents with any claim they may have with the Federal Government, including, but not limited to, pensions, compensation, educational benefits, and housing loans. The VFW operates a number of programs including, but not limited to, "Americanism", community service, "Voice of Democracy", youth activities, hospital visitations, safety seminars, and maintenance of the National Home.

The VFW is comprised of various State departments, one of which is petitioner. Petitioner was chartered by the VFW on November 14, 1920. Petitioner is comprised of about 400 local posts in Michigan. In 1974, 1975, and 1976, petitioner had between 75,000 and 80,000 members.

Petitioner is exempt from Federal income taxation under section 501(a) because it is an organization described in sections 501(c)(4) and 501(c)(19).[4]

Petitioner uses a fiscal year beginning on July 1 and ending on June 30 for both financial reporting purposes and tax reporting purposes. (See note 2 *supra*.)

From 1959 through the years in issue, petitioner had a written contract with Famous Artists' Studios, Inc./Lipschutz Organization (hereinafter sometimes referred to as Lipschutz). For the years in issue, the contract provided essentially as follows: Lipschutz was to prepare boxes of greeting cards and envelopes and mail them to the people shown on a list provided by petitioner. Lipschutz

---

[4]Petitioner received favorable group ruling letters for itself and its subordinate units under sec. 501(c)(4) and the section's predecessor (sec. 101(8), I.R.C. 1939). The parties agree that petitioner also met the requirements of sec. 501(c)(19) for the years in issue, even though petitioner did not request (and respondent did not issue) a ruling letter under the latter provision.

was to supply all work necessary to the proper handling of the program, including maintaining the list provided by petitioner and mailing three followup notices to all persons who did not pay for, or return, the box of cards by Christmas of each year.

Payments from those who received the cards were to be sent directly to petitioner, and petitioner was to deposit the funds daily into a special bank account held jointly by petitioner and Lipschutz.[5] Petitioner was to remit any returned cards to Lipschutz for "credit". Petitioner was to pay Lipschutz $0.93 for each box of cards Lipschutz mailed (see note 10 *infra*). For each box of cards returned to Lipschutz, petitioner was to receive a credit of $0.47. When the sum of (a) the payments received and (b) the credit for return cards, exceeded (c) the amounts due Lipschutz, the excess was to go to petitioner, except for up to 10 percent of the excess above $2,500, which was to be remitted to Lipschutz.[6] If the amounts received by petitioner were insufficient to pay Lipschutz the amounts due, then petitioner had no liability to Lipschutz for the unpaid amounts.[7] The contract was cancelable at the will of each party if proper notice was given in accordance with the terms of the contract.

Pursuant to this contract, in each of the years 1974, 1975, and 1976, petitioner (through VFW) provided Lipschutz with a list of its members, including new and reinstated members. This list was updated 3 times each year. Lipschutz used this list to distribute Christmas cards to petitioner's

---

[5]The 1968 version of the contract between petitioner and Lipschutz specifies that the account is to be "held jointly by ORGANIZATION [petitioner] and LIPSCHUTZ". In mid-1976, an addendum to this contract (which was in effect throughout the years in issue) removed the joint account language.

[6]On this point, the contract provides as follows:

11. After payment of all expenses of this Program, all the profit shall be retained by ORGANIZATION with the exception of a small sum paid to LIPSCHUTZ not to exceed ten percent (10%) of the net profits only after ORGANIZATION has received a net profit of Twenty-Five Hundred Dollars ($2,500.00). LIPSCHUTZ shall receive the above sum for its financing, planning, direction, supervision, et cetera.

12. LIPSCHUTZ agrees that ORGANIZATION shall in no way be financially responsible except to the extent of the money received as a result of this program.

[7]The mid-1976 addendum (see note 5 *supra*) removed this "hold-harmless" provision and replaced it with the following: "12. Any additional cards ordered and the cost of imprinting or personalizing the cards, if required, shall be billed separately." However, Lipschutz never asked petitioner to use its own funds to pay any of Lipschutz's invoices and it never was necessary for petitioner to transfer funds to the Christmas card program account, from its general operating revenues, for disbursement to Lipschutz.

members. If a member did not participate in any one of the immediately preceding 3 years, then that member's name was removed from the list. The removal of a member's name from the list had no effect on that member's status in petitioner.

Before distributing the Christmas cards to petitioner's members, Lipschutz provided petitioner with drafts of the materials which were to be included in the Christmas card distribution. On or about September 1 of 1974, 1975, and 1976, after securing approval by petitioner of the draft Christmas card package, Lipschutz distributed a package to each of the members shown on the list petitioner provided to Lipschutz. Each package included a cover letter, a box of 20 assorted Christmas cards, a return envelope, and an IBM remittance card.

The cover letter included in the package asked the recipient to pay $2 to petitioner for the 1974 mailing,[8] and $3 to petitioner for the 1975 and 1976 mailings. The literature contained in the packages stated "You can help perpetuate goodwill, Holiday cheer and Americanism by supporting the VFW Christmas Card Program * * * Here's how you help—Hospital programs for veterans—Youth activities—Legislative liaison at all government levels—Americanism and community service programs * * * REMEMBER! YOUR CONTRIBUTION IS TAX-DEDUCTIBLE."

The literature reminded members that petitioner must pay for the cards and their postage, whether accepted or not, that every unsold box adds an additional cost burden to the program, and that the cards have been sent as part of an "authorized and endorsed" or "approved" program and "should not be considered unsolicited".[9] However,

---

[8]Some of the stipulated exhibits show 1974 mailing requests for $3. However, it appears that these requests were sent by Lipschutz to members of the VFW's Department of Alabama. The 1974 mailings to petitioner's members asked for $2. We do not find in the record, any evidence that the materials Lipschutz sent to Alabama members were different from the materials Lipschutz sent to Michigan members.

[9]The solicitation literature accompanying the boxes of Christmas cards read in part as follows for the years indicated:

1974

"We must pay for the cards and their postage whether you accept them or not. And every unsold assortment adds an additional burden to program costs. Please keep in mind that these cards are sent as part of an authorized and endorsed program and should not be considered unsolicited.'

petitioner had no authority to solicit the cards on behalf of its members.

The literature pointed out that the recipient could have the Christmas cards "personalized free" if the recipient would "order three or more boxes in addition to the one enclosed." The 1975 and 1976 remittance cards state as follows: "Enclosed is $ _____ for _____ boxes of cards @ $3.00 per box. I am enclosing $3.00 for box already received."

Lipschutz sent three reminder notices per year to petitioner's members who had not participated in the Christmas card program by the time any particular notice was mailed. These notices stressed that payment from the recipients was asked for. These notices stressed the word "contribution". They also urged recipients to send "orders" for more boxes of Christmas cards, at the same price as the suggested contribution for the box of Christmas cards that had already been sent. Recipients of the boxes of Christmas cards were not under any legal obligation to pay for them. Petitioner never requested the return of any boxes of Christmas cards and never pursued collection actions on account of any member's failure to either pay or return the cards.

Funds received by petitioner as a result of its Christmas card programs were forwarded by members directly to petitioner and deposited and accounted for by petitioner's employees in a special bank account in the name of petitioner. Both petitioner and Lipschutz had to authorize withdrawals from this special account. (See note 5 *supra.*) The Christmas card program involved petitioner for about 1 week of time per month from September through February of each year.

1975

"We must pay for the cards and their postage whether you accept them or not. Every unsold assortment therefore adds an additional cost burden to the Christmas card program. In addition, the costs of supporting our own programs have risen. Your cards have been sent as part of an authorized and endorsed program. They should not be considered unsolicited. Please help us keep costs down. Please participate now."

1976

"We have to pay for cards and their postage whether you send your contribution or not. Every unaccepted box of cards, therefore, adds an extra expense to the Christmas Card Program. In addition, the costs of maintaining our own programs have risen. Your cards have been sent as part of an approved program. They should not be considered unsolicited. Please help us fight inflation. Please participate now."

The services Lipschutz provided for petitioner with regard to the Christmas card program for petitioner's taxable years 1975, 1976, and 1977, consisted of preparing and providing the Christmas cards, envelopes, and box; preparing and supplying the cover letter, order blank, return envelope, addressed return (IBM) card; collating and assembling; addressing and sorting for Post Office breakdown; counting and bonding; sorting; tying; sacking; delivering to Post Office; providing postage for mailing; maintaining files; preparing and supplying reminder notices and the accompanying return envelopes and mailing envelopes; addressing, sorting, tying, sacking and delivering reminder notices to the Post Office; and providing postage for the reminder notices.

Petitioner paid Lipschutz $0.89 for the above-mentioned materials and services for each Christmas card package Lipschutz distributed to petitioner's members for the taxable year 1975. For the taxable years 1976 and 1977, petitioner paid Lipschutz $1.15 per package for the above-mentioned materials and services.[10]

Table 1 shows petitioner's membership's response to Lipschutz's mailings of Christmas cards.

Table 1

| Amount of transfer | Number of boxes mailed in taxable year | | |
|---|---|---|---|
| | 1975 | 1976 | 1977 |
| No participation[1] | 15,688 | 16,500 | 18,767 |
| $0.00[2] | 1,197 | 2,472 | 2,033 |
| 0.01-1.99 | 131 | 82 | 78 |
| 2.00 | 29,680 | 630 | 281 |
| 2.01-2.99 | 48 | 3 | 4 |
| 3.00 | 751 | 28,555 | 26,791 |
| 3.01-3.99 | 4 | 26 | 32 |
| 4.00-4.99 | 384 | 113 | 254 |
| 5.00-5.99 | 618 | 821 | 1,984 |
| 6.00-6.99 | 21 | 208 | 205 |
| 7.00-7.99 | 1 | 6 | 2 |
| 8.00-8.99 | 7 | 5 | 6 |
| 9.00-9.99 | 1 | 7 | 7 |
| 10.00-10.99 | 44 | 57 | 149 |

[10]The parties agree that petitioner paid the prices shown in our findings and not the $0.93 price set forth in the contract, *supra*; the parties acknowledge the discrepancy but have not sought to explain it.

| 11.00 and above | 5 | 10 | 18 |
| Subtotal | 48,580 | 49,495 | 50,611 |
| Additional orders[1] | 1,361 | 713 | 1,360 |
| Total boxes shipped | 49,941 | 50,208 | 51,971 |

[1]Estimated.

[2]Those who participated in the program by returning the remittance card without making a monetary transfer are listed in this row to distinguish them from those who did not respond at all.

Petitioner's audited financial statements include the information shown in table 2 as to major revenue sources.

Table 2

| | Taxable year | | | |
| Revenue item | 1974 | 1975 | 1976 | 1977 |
|---|---|---|---|---|
| Department dues | $172,153 | [11]$163,608 | $194,524 | $206,111 |
| Christmas cards | 18,600 | 30,540 | 38,920 | 39,580 |
| Poppies, net | 29,494 | 24,457 | 25,903 | 26,187 |
| Interest earned | 11,473 | 12,778 | 12,605 | 14,108 |
| Life members' dues | 7,809 | [11]18,736 | 23,418 | 27,962 |
| Other | 23,294 | 24,711 | 25,678 | 24,374 |
| Total revenues | 262,823 | 274,830 | 321,048 | 338,322 |

During the years in issue, Lipschutz conducted Christmas card programs involving mailings through frequently updated membership lists, for about three-fourths of the VFW's departments. During the years in issue, Lipschutz' sole clientele was nonprofit tax-exempt organizations, and a major portion of Lipschutz' business involved Christmas card programs the same as those it conducted for petitioner. In material it sent to petitioner on September 13, 1976, and October 6, 1977, Lipschutz represented that, although each package cost $1.15 (see note 10 *supra*), the cards alone in each package had a retail value of $7 to $9.

There are numerous private business enterprises within the State of Michigan whose activities constitute a trade or business within the meaning of the Internal Revenue Code that are engaged in the sale of cards, including Christmas

[11]The taxable year 1975 amounts on the 1975 financial statement show Department dues as $172,976 and life members' dues as $9,368. Our findings are in accord with the taxable year 1975 amounts on the 1976 financial statement, which apparently involves a reallocation of $9,368 from Department dues to life members' dues.

cards, for profit. The sale of Christmas cards is an activity normally undertaken by nonexempt commercial organizations only on a seasonal basis. The Christmas cards Lipschutz distributed on behalf of petitioner were used by petitioner's members and others for mailing to friends and relatives. Hallmark Cards Inc. viewed the Christmas cards Lipschutz distributed for exempt organizations like petitioner as competition in the Christmas card market since individuals using cards distributed by Lipschutz for tax-exempt organizations reduced the opportunity for Hallmark Cards Inc. to sell cards to a significant share of the Christmas card market. During 1974, 1975, and 1976, Lipschutz' share of the Christmas card market was 1.52 percent, 1.84 percent, and 2.12 percent, respectively. This was a significant share of the Christmas card market.

No nonexempt commercial distributors of greeting cards distributed cards only during the Christmas season. No nonexempt commercial distributors of greeting cards distributed only Christmas cards. Nonexempt commercial distributors of greeting cards who solicited by mail used the devices of catalogs and prior orders before sending out their greeting cards, and they required orders or payments before sending out cards. Nonexempt commercial distributors of greeting cards distributed Easter cards, Father's Day cards, Mother's Day cards, Thanksgiving cards, and other greeting cards in addition to Christmas cards. During taxable years 1975, 1976, and 1977, about 13 percent of greeting cards were distributed by direct marketing or mail including tax-exempt organizations.

Petitioner did not report any unrelated business taxable income on the information returns it filed for the years in issue (it reported a loss from its unrelated trade or business of advertising for its taxable year 1977). Table 3 shows respondent's determinations as to petitioner's unrelated business income, modified to take into account respondent's concessions (other than the concession described *infra* that receipts in excess of $5 on any box are excludable from gross income).

Table 3

| | Taxable year | | |
| --- | --- | --- | --- |
| | 1975 | 1976 | 1977 |
| Gross receipts from the Christmas card program | $74,966 | $97,210 | $99,950 |
| Deductions | 48,341 | 62,384 | 65,406 |
| Unrelated business taxable income from the Christmas card program as determined by respondent | 26,625 | 34,826 | 34,544 |
| Losses from unrelated business of advertising | (2,871) | (4,728) | (4,821) |
| Unrelated business income as determined by respondent | 23,754 | 30,098 | 29,723 |

Petitioner conducted the Christmas card program with the predominant intent of producing income.

Petitioner's Christmas card program was in substance the sale of goods.

Petitioner's Christmas card program was a trade or business that it regularly carried on.

Petitioner's Christmas card program effectively competed with Christmas cards marketed by commercial, taxpaying entities.

Apart from petitioner's use of the proceeds it derived, petitioner's Christmas card program had as only an incidental effect and purpose, the advancement of petitioner's exempt purposes.

The fair market value of the Christmas cards petitioner sent in taxable year 1975 was $2 per box; in 1976 and 1977, $3 per box. Those who paid to petitioner more than the foregoing amounts per box intended to make gifts of the excess to petitioner.

## OPINION

Respondent contends that the profits derived from the operation of petitioner's 1974, 1975, and 1976 Christmas card programs are subject to the tax on unrelated business income. In support of this contention, respondent asserts that petitioner's Christmas card program was a "trade or business" (included in this is the assertion that the Christmas cards petitioner distributed to its members were not "low cost articles"), petitioner's Christmas card program

was "regularly carried on", and petitioner's Christmas card program did not bear a "substantial relation" to petitioner's exempt purposes.

Petitioner contends that the cards it sent to its members were gifts to them and the money its members sent to it were gifts to it, not includable in its income. Petitioner contends that its Christmas card program was merely a means of requesting additional voluntary dues, not a trade or business; also, there were no "sales", and so no activity of the sort which the Congress had intended to treat as a trade or business. In addition, petitioner contends, there was no unfair competition and so its activities are not what the Congress aimed at when the Congress enacted the unrelated trade or business provisions. In addition, petitioner maintains that since under Federal and Michigan law, the recipient has no obligation to the sender, petitioner would have no reasonable expectation of receiving income, let alone a profit, and therefore petitioner's activity does not constitute a trade or business. Petitioner also asserts that it is not subject to the unrelated business income tax since the utilization of the Christmas cards as a "premium is substantially related to the Petitioner's exempt purpose of promoting comradeship amongst petitioner's members." Petitioner further contends that the Christmas cards are low-cost articles, which were sent incidental to the solicitation of charitable contributions and, consequently, its activity falls within an exception to the unrelated business income tax. Petitioner also asserts that its activity is not subject to the unrelated business income tax because the activity was not regularly carried on.

In the alternative, petitioner maintains that, even if it is taxable on its Christmas card program, its receipts in excess of the lesser of (a) the amounts it asked the recipients to pay[12] and (b) the fair market value of the cards[13] are gifts and so are excludable from tax. Respondent contends that the fair market value is $3 to $5 per box and, on answering brief, agrees that receipts in excess of $5

---

[12]$2 per box for taxable year 1975 and $3 per box for taxable years 1976 and 1977.

[13]Petitioner asserts that the fair market values per box are $1.45, $1.59, and $1.77 for taxable years 1975, 1976, and 1977, respectively.

18

on any box are excludable from petitioner's unrelated business income.

We agree with respondent's conclusion as to the taxability of petitioner's Christmas card program under the unrelated business income tax. We agree with part of petitioner's alternative contention, in that its receipts on any box in excess of $2 for taxable year 1975, and $3 for taxable years 1976 and 1977, are excludable from its unrelated business income.

Under section 501(a),[14] petitioner is exempt from income tax because it is an organization described in paragraphs (4) and (19) of section 501(c).[15] Nevertheless, as the Congress warned in section 501(b),[16] petitioner is an organization to which the tax on unrelated business taxable income (secs.

[14]SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

[15]SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

\* \* \* \* \* \* \*

(4) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

\* \* \* \* \* \* \*

(19) A post or organization of war veterans, or an auxiliary unit or society of, or a trust or foundation for, any such post or organization—
    (A) organized in the United States or any of its possessions,
    (B) at least 75 percent of the members of which are war veterans and substantially all of the other members of which are individuals who are veterans (but not war veterans), or are cadets, or are spouses, widows, or widowers of war veterans or such individuals, and
    (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual.

[The subsequent amendment of sec. 501(c)(19) by sec. 354(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub L. 97-248, 96 Stat. 324, 640) does not apply to the instant case.]

[16]SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(b) TAX ON UNRELATED BUSINESS INCOME AND CERTAIN OTHER ACTIVITIES.—An organization exempt from taxation under subsection (a) shall be subject to tax to the extent provided in parts II, III and VI of this subchapter, but (notwithstanding parts II, III and VI of this subchapter) shall be considered an organization exempt from income taxes for the purpose of any law which refers to organizations exempt from income taxes.

[This includes an amendment made by sec. 10(c) of Pub. L. 93-625, 88 Stat. 2108, 2119, which applies to petitioner's taxable years 1976 and 1977 but not petitioner's taxable year 1975. This amendment does not affect the instant case.]

511 et seq.,[17] the part III referred to in sec. 501(b))
applies.[18]

Under sections 512(a)(1) and 513(a), the Christmas card
program produces unrelated business income only if the
program (1) constitutes a trade or business; (2) is regularly
carried on; and (3) is not substantially related to petitioner's
tax-exempt purpose. *United States v. American Bar Endow-
ment*, 477 U.S. 105, ____ (1986); *United States v. American
College of Physicians*, 475 U.S. 834, 838 (1986); *Professional
Ins. Agents of Michigan v. Commissioner*, 726 F.2d 1097,
1102 (6th Cir. 1984), affg. 78 T.C. 246, 257-258 (1982).

These requirements are in the conjunctive. As a result,
although petitioner has the burden of proof (*Welch v.

---

[17]Secs. 511, 512, and 513 provide, in pertinent part, as follows:

SEC. 511. IMPOSITION OF TAX ON UNRELATED BUSINESS INCOME OF
        CHARITABLE, ETC., ORGANIZATIONS.

(a) CHARITABLE, ETC., ORGANIZATIONS TAXABLE AT CORPORATION RATES.—

(1) IMPOSITION OF TAX.—There is hereby imposed for each taxable year on the unrelated
business taxable income (as defined in section 512) of every organization described in
paragraph (2) a normal tax and a surtax computed as provided in section 11. In making
such computation for purposes of this section, the term "taxable income" as used in section
11 shall be read as "unrelated business taxable income".

(2) ORGANIZATIONS SUBJECT TO TAX.—

(A) ORGANIZATIONS DESCRIBED IN SECTIONS 401(a) AND 501(c).—The taxes imposed by
paragraph (1) shall apply in the case of any organization (other than a trust described in
subsection (b) or an organization described in section 501(c)(1)) which is exempt, except
as provided in this part or part II (relating to private foundations), from taxation under
this subtitle by reason of section 501(a).

SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.

(a) DEFINITION.—For purposes of this title—

(1) GENERAL RULE.—Except as otherwise provided in this subsection, the term "unrelated
business taxable income" means the gross income derived by any organization from any
unrelated trade or business (as defined in section 513) regularly carried on by it, less the
deductions allowed by this chapter which are directly connected with the carrying on of such
trade or business, both computed with the modifications provided in subsection (b).

SEC. 513. UNRELATED TRADE OR BUSINESS.

(a) GENERAL RULE.—The term "unrelated trade or business" means, in the case of any
organization subject to the tax imposed by section 511, any trade or business the conduct of
which is not substantially related (aside from the need of such organization for income or
funds or the use it makes of the profits derived) to the exercise or performance by such
organization of its charitable, educational or other purpose or function constituting the basis
for its exemption under section 501 * * *

[The subsequent amendment of sec. 511(a) by sec. 301(b)(5) of the Revenue Act of 1978 (Pub.
L. 95-600, 92 Stat. 2763, 2821) does not apply to the instant case.]

[18]Sec. 512(a)(4) provides a special rule for sec. 501(c)(19) organizations with regard to certain
types of insurance. This special rule is not relevant to the instant case. In other matters, the
unrelated business income tax rules generally applicable to sec. 501(c) organizations apply to
sec. 501(c)(19) organizations. Sec. 1.512(a)-4(a), Income Tax Regs. As a result (apart from a
possible impact on the "substantially related" question (part III *infra*)), it is immaterial for
our purpose whether we focus on petitioner's sec. 501(c)(4) status or its sec. 501(c)(19) status.

*Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure) as to each of the requirements, petitioner avoids the tax entirely if it can show that any one of these requirements has not been satisfied. We consider these requirements seriatim.

## I. *Trade or Business*

If an activity is carried on for the production of income from the sale of goods or the performance of services, then it is a "trade or business" within the meaning of section 513(c).[19] *United States v. American Bar Endowment*, 477 U.S. at ____.[20]

*Intent*

In determining whether petitioner carried on the Christmas card program for the production of income, our inquiry is directed at petitioner's intent in carrying on the activity. We must determine whether petitioner carried on the Christmas card program with the intent of producing income, or stated another way, whether petitioner had a profit motive. E.g., *Professional Ins. Agents of Michigan v. Commissioner*, 726 F.2d at 1102, 78 T.C. at 262; *St. Joseph Farms of Indiana v. Commissioner*, 85 T.C. 9, 20-21 (1985).

For each of the years in issue, the Christmas card program produced substantial profits. Indeed, other than membership dues, the Christmas card program was petitioner's largest revenue source during each of the years in issue (see table 2 *supra*). Petitioner's contract with Lipschutz described petitioner's revenue from the Christmas card program as "profit" (see note 6 *supra*). The record does not

---

[19]SEC. 513. UNRELATED TRADE OR BUSINESS.

(c) ADVERTISING, ETC., ACTIVITIES.—For purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Where an activity carried on for profit constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

[20]Sec. 513(c) provides that trade or business "includes" the goods or services test. We recognize, of course, that a person may be in a trade or business even though the person is not selling goods or performing services. *Commissioner v. Groetzinger*, 480 U.S. ____ (1987). The test we apply in the instant case is sufficient for the purposes of the instant case and we do not explore the ramifications of *Groetzinger* in the unrelated business income tax area.

show that petitioner's revenue from the Christmas card program was merely an incidental by-product of a programmatic activity. Finally, we are impressed by the testimony of petitioner's quartermaster/adjutant, as follows:

Q. [Respondent counsel on cross examination]
Mr. Schumacher, it is accurate to say that the Petitioner's objective, the Christmas Card Program, was to make a profit; isn't it?
A. It's to supplement the dues that the members pay, that's correct. Otherwise, they would—
Q. Mr. Schumacher—Excuse me, I'm sorry.
A. Otherwise, they'd be paying more dues.
Q. But in answer to my question it is accurate you were trying to generate a profit from the program, is it not?
A. That is the object of it. I would say because that is the reason they all get into it.
Q. Well, in fact, if the program had not produced a profit, you would have terminated the program; would you not?
A. Right.

           \*       \*       \*       \*       \*       \*       \*

THE COURT: Mr. Schumacher, you testified, I believe, that the object of this program was to produce some net revenues that would either reduce the dues or at least delay the necessity of asking for an increase of dues?
THE WITNESS: Correct.

We believe the witness. Petitioner conducted the Christmas card program in order to produce income, and would not have conducted the Christmas card program if it had not produced income.

We conclude, and we have found, that petitioner conducted the Christmas card program with the predominant intent of producing income.

*Sale of Goods*

We next consider whether the Christmas card program was in substance a "sale of goods", within the meaning of section 513(c). (See note 19 *supra*).

In general, the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. E.g., *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). A taxpayer has the right to minimize taxes as far as the law allows(*United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950); *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *United States v. Isham*, 84 U.S. 496, 506

(1873)); however, the taxpayer ordinarily may not, through form alone, achieve tax advantages which substantively are without the intent of the statute. *Commissioner v. Court Holding Co., supra; Gregory v. Helvering, supra.*

Each year, petitioner (through Lipschutz) sent a box of Christmas cards, with literature soliciting funds and orders for more boxes, to each of the people on the list that Lipschutz maintained pursuant to the contract. Each year, a small portion of these people (see table 1 *supra*) ordered more boxes of Christmas cards at the prices set forth ($2 in the 1974 program and $3 in the 1975 and 1976 programs) in the literature enclosed with the boxes. Clearly, with regard to these ordered boxes (about 2 to 4 percent of the total sent to people who participated in the program), petitioner was engaged in the sale of goods.

In each of the years, petitioner solicited a "contribution" of a specified amount for each box. In each of the years, about 85 to 90 percent of those who responded (including those who responded only by returning the remittance card without any payment) sent to petitioner precisely the amount of the requested "contribution" (see table 1 *supra*). As petitioner points out, under both Federal law (39 U.S.C. sec. 3009[21]) and Michigan law (Mich. Comp. Laws sec. 445.131[22] (1986); Mich. Stat. Ann. sec. 19.416 (51) (Cal-

---

[21]Sec. 3009. Mailing of unordered merchandise

(a) Except for (1) free samples clearly and conspicuously marked as such, and (2) merchandise mailed by a charitable organization soliciting contributions, the mailing of unordered merchandise or of communications prohibited by subsection (c) of this section constitutes an unfair method of competition and an unfair trade practice in violation of section 45(a)(1) of title 15.

(b) Any merchandise mailed in violation of subsection (a) of this section, or within the exceptions contained therein, may be treated as a gift by the recipient, who shall have the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender. All such merchandise shall have attached to it a clear and conspicuous statement informing the recipient that he may treat the merchandise as a gift to him and has the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender.

(c) No mailer of any merchandise mailed in violation of subsection (a) of this section, or within the exceptions contained therein, shall mail to any recipient of such merchandise a bill for such merchandise or any dunning communications.

(d) For the purposes of this section, "unordered merchandise" means merchandise mailed without the prior expressed request or consent of the recipient.

[22]Sec. 445.131. Unsolicited sending of goods, prohibition, effect, recipient's rights.

Sec. 1. No person, firm, partnership, association or corporation, or agent or employee thereof, in any manner, or by any means, shall offer for sale goods where the offer includes the voluntary and unsolicited sending of goods by mail or otherwise not actually ordered or requested by the recipient, either orally or in writing. The receipt of any such unsolicited goods shall be deemed for all purposes an unconditional gift to the recipient. The recipient

laghan 1981)), the recipients of the boxes of Christmas cards had no obligation to pay for the cards; indeed, the recipients were by the terms of both statutes free to treat the cards as gifts. This is the result under both statutes because the boxes of Christmas cards in the basic mailings had not been ordered or requested or solicited by the recipients.

However, the literature accompanying the unsolicited boxes of Christmas cards stated, for each of the years in issue, that the cards "should not be considered unsolicited." These statements appear to be directly contrary to the requirement of the Federal Statute that—

All such merchandise [including "merchandise mailed by a charitable organization soliciting contributions"] shall have attached to it a clear and conspicuous statement informing the recipient that he may treat the merchandise as a gift to him and has the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender.

Petitioner's statements to the recipients of the boxes of Christmas cards appear to be designed to cause these recipients to not believe that they could "retain, use, discard, or dispose of" the cards "without any obligation whatsoever to" petitioner.

Because of the mechanics of the transactions (in particular, the shipment of the goods in advance), the recipients had extraordinary leverage. They could pay whatever they wished—or nothing. Petitioner chose the mechanics and tried to persuade the recipients that they did not have the right to treat the goods as unsolicited gifts. If the recipients had understood that they had no obligations to pay and were really being solicited for contributions, we might have expected to see a substantial scattering of contribution amounts. However, each year 85 to 90 percent of those who responded paid precisely the amount that was requested by petitioner—the same amount that petitioner stated it was charging for additional boxes.

Since petitioner's actions were inconsistent with the statutes freeing the recipients from any obligations to pay for the boxes, we will not allow petitioner to hide behind

---

may refuse to accept delivery of the goods, is not bound to return them to the sender, and may use or dispose of them in any manner he sees fit without any obligation on his part to the sender.

these statutes. Petitioner chose to so arrange the transactions as to make it appear that there was an obligation. The responses of substantially all the recipients who participated in the program were consistent with an understanding that there was an obligation. We conclude that the substance of substantially all the unsolicited transactions, and the small number of solicited transactions, was an exchange of boxes of Christmas cards for the sums specified by petitioner.

We conclude, and we have found, that petitioner's Christmas card program was in substance the sale of goods.

On brief, petitioner states as follows:

> It is the Petitioner's contention herein that, as a matter of law, the mailing of the solicitation package, including the Christmas cards, constitutes a gift from the Petitioner and any contributions from the recipients thereof constitute gifts to the Petitioner.

We have already concluded that the transactions were, in substance, sales. We do not believe that petitioner and its members engaged in a program of reciprocal gift-giving.[23]

The Supreme Court dealt with a similar contention in *United States v. American Bar Endowment*, 477 U.S. at ___ , as follows:

> The only valid argument in ABE's favor, therefore, is that the insurance program is billed as a fundraising effort. That fact, standing alone, cannot be determinative, or any exempt organization could engage in a tax-free business by "giving away" its product in return for a "contribution" equal to the market value of the product. * * *

Based on all the facts and circumstances, we conclude, and we have found, that petitioner's Christmas card program was an activity which constituted a "trade or business", within the meaning of subsections (a) and (c) of section 513.

## Competition

Petitioner contends that the unrelated business income tax is designed to eliminate unfair competition between

---

[23]The custom of couching what is in substance a purchase and sale, in language of reciprocal gifts, long antedates the instant case. See, e.g., Genesis, ch. 23, in which, millenia ago, Ephron purported to make a gift to Abraham (the cave of Machpelah, in which Abraham then buried Sarah) and Abraham apparently made a gift to Ephron (400 shekels of silver). Two generations later, Jacob's sons buried their father in the same cave. (Gen. 50:13.)

taxable and tax-exempt entities. If there is no unfair competition, petitioner suggests, then there is no basis for imposing the tax.[24]

We agree with petitioner's understanding of the history of the statute, but not with petitioner's understanding of the statute itself. Also, we disagree with petitioner's contention that it was not competing with taxable entities.

Firstly, although the unfairness of business competition between taxable and tax-exempt entities prompted the Congress to enact in 1950 the predecessors of the provisions we apply in the instant case (see, e.g., the brief historical analysis in *United States v. American College of Physicians*, 475 U.S. at 838), the statute that the Congress enacted does not set forth any references to competition, unfair or otherwise. This Court has not interpreted the statute to be applicable only where there is unfair competition. *Smith-Dodd Businessman's Association Inc. v. Commissioner*, 65 T.C. 620, 624 (1975). See discussion in *Ill. Association of Professional Ins. Agents v. Commissioner*, 801 F.2d 987, 990-991 (7th Cir. 1986), affg. a Memorandum Opinion of this Court;[25] *Disabled American Veterans v. United States*, 227 Ct. Cl. 474, 488-490, 650 F.2d 1178, 1187 (1981); *Fraternal Order of Police v. Commissioner*, 87 T.C. 747, 756 (1986), on appeal (7th Cir. 1987).

---

[24]Petitioner points us to sec. 1.513-1(b), Income Tax Regs., which provides in pertinent part, as follows:

Sec. 1.513-1. Definition of unrelated trade or business.

(b) *Trade or business*. The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition, by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete. On the other hand, where an activity does not possess the characteristics of a trade or business within the meaning of section 162, such as when an organization sends out low cost articles incidental to the solicitation of charitable contributions, the unrelated business income tax does not apply since the organization is not in competition with taxable organizations. However, in general any activity of a section 511 organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute "trade or business" within the meaning of section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax. Accordingly, for purposes of section 513 the term "trade or business" has the same meaning it has in section 162, and generally includes any activity carried on for the production of income from the sale of goods or performance of services. * * *

[The second sentence, relating to low-cost articles, was added by par. 3 of T.D. 7392, filed Dec. 17, 1975, 1976-1 C.B. 162, 168. Since the T.D. did not have an effective date for par. 3; the low-cost-articles sentence apparently applies to all the years in issue. Sec. 7805(b).]

[25]T.C. Memo. 1985-105.

Secondly, during 1974 through 1976, Lipschutz enjoyed a 1.5- to 2.1-percent share of the total Christmas card market. This is a significant portion of a nationwide industry. While petitioner is only one of many organizations that market Christmas cards in this manner through the use of the Lipschutz organization, there is no doubt that petitioner's product displaces and competes with Christmas cards marketed by commercial, taxpaying entities. This is precisely the type of situation to which the unrelated business income tax provisions were designed to apply.[26]

## Low Cost Articles

Petitioner argues that its Christmas card program is not a trade or business because the cards are low cost articles sent incidental to the solicitation of charitable contributions. Petitioner contends that its cost for each box of cards was $0.535, about half of the total amount it paid to Lipschutz. Petitioner relies on the second sentence of section 1.513-1(b), Income Tax Regs. (see note 24 *supra*), the legislative history of the Tax Reform Act of 1969,[27] *Disabled American Veterans v. United States*, *supra*, and *Hope School v. United States*, 612 F.2d 298 (7th Cir. 1980).

We agree with petitioner that the regulation appears to be consistent with the legislative history and is valid. We disagree with petitioner's view of the significance of the regulation, the legislative history, and the two cases.

Firstly, as the Court of Claims pointed out in *Disabled American Veterans v. United States*, 650 F.2d at 1187, the relevant comparison is that between the payment made and the retail value (not the cost) of the article.[28]

---

[26]This is discussed further in connection with our analysis of petitioner's contentions regarding the significance of *Hope School v. United States*, 612 F.2d 298 (7th Cir. 1980), to petitioner's low-cost-articles argument *infra*.

[27]The Senate Finance Committee report, S. Rept. 91-552, at 71 (1969), 1969-3 C.B. 423, 469, states as follows:

"The committee, also, intends that when organizations send out low cost articles incidental to the solicitation of charitable contributions, the amounts received are not to be considered as being in exchange for the low cost articles where it is clear that the contributions, less a reasonable administrative cost, fully accrue to the exempt organization."

To the same effect is Staff of the Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1969, at 69-70 (Comm. Print 1970).

[28]In *Disabled American Veterans v. United States*, 227 Ct. Cl. 474, 487-488, 650 F.2d 1178, 1186 (1981), the Court of Claims focused on the following item of legislative history:

Secondly, in the instant case, petitioner maintains that the fair market values (at retail) of the boxes of cards are $1.45, $1.59, and $1.77 for the taxable years 1975, 1976, and 1977, respectively. The solicited amounts were $2, $3, and $3 for the same years, respectively. Respondent contends that the retail values are between $3 and $5 per box. We have found that the fair market value of the Christmas cards petitioner sent in taxable year 1975 was $2 per box; in 1976 and 1977, $3 per box. Apart from that finding, it is clear that the solicited amounts were "within a reasonable range" of the retail values of the Christmas cards (*Commissioner v. Brown*, 380 U.S. 563, 572 (1965)), and that the Christmas cards thus were not "low-cost articles", and so we conclude that the "low-cost-article" exception does not apply. As we see it, then, the analysis in the Court of Claims' opinion in *Disabled American Veterans v. United States, supra,* serves to bolster respondent's case and not petitioner's case.

Finally, petitioner cites *Hope School v. United States, supra,* for the proposition that the box of cards in the instant case is a low-cost item as a matter of law. In *Hope School,* the facts were similar to those in the instant case. Hope School was a nonprofit charitable and educational organization exempt from Federal income tax under section 501(c)(3). Hope School entered into a contract with American Mailing Consultants whereby (612 F.2d at 300)—

American Mailing sent out packages of greeting cards to prospective donors, with information about the School and a request for contributions. The recipients of the cards were under no obligation to give any money to the School and were free to keep the cards at no charge. American Mailing bore the entire economic risk of the operation: when the recipients of the cards kept the package without making a contribu-

"In testimony before the Senate Finance Committee prior to issuance of S.Rep. No. 91-552, *supra,* DAV's then national adjutant had described DAV's 'idento-tag' program and, in addition, noted that:

" 'The DAV also sends out other mailings describing its work, requesting donations for it, and suggesting that various books, usually with patriotic themes, will be sent upon receipt of a contribution in a certain amount. The amount of the contribution is far in excess of the commercial value, if any, of the particular book.'

"The national adjutant also testified:

" 'Such solicitation technique is not a commercial business transaction where the motive of the individual in parting with money is the receipt of a quid pro quo in material goods.'

"2 *Senate Hearings before the Senate Finance Committee on the Tax Reform Act of 1969,* 91st Cong., 1st Sess. 1161 (1969)."

tion, American Mailing suffered the loss. When contributions were received, however, American Mailing kept the first $1.10 per package, with all the surplus going to the Hope School. [Fn. ref. omitted.]

## The Court of Appeals stated as follows (612 F.2d at 304):

This evidence in the legislative history, coupled with the Service's express mention of unfair competition in the context of the "low cost articles" exception supports our conclusion that unfair competition is the key to whether the activities of the Hope School constitute an unrelated trade or business as a matter of law. We hold that they do not.

There was no evidence presented at trial to suggest that Hope School's solicitation campaign presented the possibility of an unfair competitive advantage over taxpaying greeting card businesses. * * *

* * * We find no problem with unfair competition in this case and hold that, as a matter of law, the greeting cards were distributed as low cost articles incidental to the solicitation of charitable contributions.

It is not clear that *Hope School* retains its full vitality after *United States v. American College of Physicians*, *supra*. See *Ill. Association of Professional Ins. Agents v. Commissioner*, 801 F.2d at 991; *Fraternal Order of Police v. Commissioner, supra*.

*Hope School* apppeared to rest on the Court of Appeals' conclusion about the state of the record therein regarding unfair competition. However, in *Ill. Association of Professional Ins. Agents v. Commissioner*, 801 F.2d at 991 n. 4, the Court of Appeals for the Seventh Circuit seems to deny that that is the thrust of *Hope School*.[29] In any event, we have found in the instant case that Lipschutz enjoyed a significant portion of the Christmas card market, and that

---

[29]"4. Courts utilizing the unfair competition test [*Disabled American Veterans v. United States*, 650 F.2d 1178, 227 Ct. Cl. 474 (1981); *Hope School v. United States*, 612 F.2d 298 (7th Cir. 1980); *Carle Foundation v. United States*, 611 F.2d 1192 (7th Cir. 1979)] cite the legislative history of the Act for the proposition that Congress' primary purpose in imposing the tax on unrelated business income was to eliminate unfair competition. Proponents of the profit motive test, however, claim that profit motive is sufficient indication of a 'business' if the activity is not substantially related to exempt purposes, relying on the 'conclusive presumption' created in section 1.513[-1](b) of the regulations. That section provides that, in general, any activity of [an exempt] organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute 'trade or business' within the meaning of section 162—and which, in addition, is not substantially related to the performance of exempt functions—presents sufficient likelihood of unfair competition to be within the policy of the tax. 26 C.F.R. sec 1.513[-1](b).

"Read carefully, the two lines of cases are not in conflict. No court has yet created a general exception to the unrelated business income tax based solely on a showing that the tax-exempt organization did not compete, or threaten to compete unfairly with tax-paying entities. Rather, the cases hold that activities engaged in for the production of income do not constitute a 'trade or business' within the meaning of section 513(c) where the income is derived from charitable contributions rather than from the sale of goods or the performance of a service."

its Christmas cards (distributed through petitioner and other tax-exempt organizations) reduced the opportunity for at least one major taxable competitor to sell its own Christmas cards to a significant share of the Christmas card market. We believe that, whatever the role that competition may play in determining liability for the tax on unrelated business income,[30] the record in the instant case includes sufficient evidence of such competition.

Further, we have concluded that the articles were worth as much as was paid for them by most of the recipients who paid (see table 1 *supra*). Also we have concluded that the recipients who paid the requested amounts were, as a matter of substance, buying the cards and not making contributions. Accordingly, we conclude that the Christmas cards were not distributed as low-cost articles incidental to the solicitation of charitable contributions.[31]

We hold for respondent on the trade or business issue.

## II. *Regularly Carried On*

In examining the application of a particular statute, our first reference must be to the words of that statute. E.g.,

---

[30]In *United States v. American Bar Endowment*, 477 U.S. 105, ___ (1986), the Supreme Court stated as follows:

"The Claims Court also erred in concluding that ABE's insurance program did not present the potential for unfair competition. The undisputed purpose of the unrelated business income tax was to prevent tax-exempt organizations from competing unfairly with businesses whose earnings were taxed. H.R.Rep. No. 2319, 81st Cong., 2d Sess., 36 (1950); see *United States v. American College of Physicians*, 475 U.S. at ___. This case presents an example of precisely the sort of unfair competition that Congress intended to prevent. If ABE's members may deduct part of their premium payments as a charitable contribution, the effective cost of ABE's insurance will be lower than the cost of competing policies that do not offer tax benefits. Similarly, if ABE may escape taxes on its earnings, it need not be as profitable as its commercial counterparts in order to receive the same return on its investment. Should a commercial company attempt to displace ABE as the group policyholder, therefore, it would be at a decided disadvantage."

[31]Sec. 1601(a) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2766) added subsec. (h) to sec. 513, to provide certain rules with regard to low-cost articles. The Ways and Means Committee report (H. Rept. 99-426, at 867 (1985)) states the following as the reason for the change:

"The committee believes that it is appropriate to specify the circumstances under which certain distributions of low cost articles incidental to soliciting charitable contributions are not treated as unrelated trade or business activities. * * *"

The provision is not in the Senate amendment. It does not appear that the distributions of the Christmas cards in the instant case would qualify under new sec. 513(h) of the Internal Revenue Code of 1986. In any event, the rules of sec. 513(h) of the Internal Revenue Code of 1986 apply to distributions of low cost articles after Oct. 22, 1986, the date of the 1986 Act's enactment, and so do not affect the instant case.

*Minahan v. Commissioner*, 88 T.C. 492, 503 (1987); *Service Bolt & Nut Co. Trust v. Commissioner*, 78 T.C. 812, 817 (1982), affd. 724 F.2d 519 (6th Cir. 1983). Under section 512(a)(1) (see note 17 *supra*), even if an exempt organization engages in a trade or business, the income therefrom is not subject to the unrelated business income tax unless the organization regularly carries on that trade or business.[32] *Suffolk County Patrolmen's Association v. Commissioner*, 77 T.C. 1314 (1981). However the statute does not describe what criteria are to be used in determining whether a trade or business is "regularly carried on by [the organization]". There has been little case law on the "regularly carried on" provision in the statute, even though the predecessor of the current statutory provision was enacted 37 years ago. Both parties look to the regulations for guidance; we now proceed to a consideration of the regulations.

Paragraph (c) of section 1.513-1, Income Tax Regs.,[33]

---

[32]Sec. 512(a)(3) provides separate rules for social clubs and certain other categories of exempt organizations, as to which we have held that the "regularly carried on" requirement does not apply. *Ye Mystic Krewe of Gasparilla v. Commissioner*, 80 T.C. 755, 762-765 (1983). In the instant case, neither side contends that petitioner falls into any of the sec. 512(a)(3) categories.

[33]Sec. 1.513-1. Definition of unrelated trade or business.

(c) *Regularly carried on*—(1) *General principles.* In determining whether trade or business from which a particular amount of gross income derives is "regularly carried on," within the meaning of section 512, regard must be had to the frequency and continuity with which the activities productive of the income are conducted and the manner in which they are pursued. This requirement must be applied in light of the purpose of the unrelated business income tax to place exempt organization business activities upon the same tax basis as the nonexempt business endeavors with which they compete. Hence, for example, specific business activities of an exempt organization will ordinarily be deemed to be "regularly carried on" if they manifest a frequency and continuity, and are pursued in a manner generally similar to comparable commercial activities of nonexempt organizations.

(2) *Application of principles in certain cases*—(i) *Normal time span of activities.* Where income producing activities are of a kind normally conducted by nonexempt commercial organizations on a year-round basis, the conduct of such activities by an exempt organization over a period of only a few weeks does not constitute the regular carrying on of trade or business. For example, the operation of a sandwich stand by a hospital auxiliary for only 2 weeks at a state fair would not be the regular conduct of trade or business. However, the conduct of year-round business activities for one day each week would constitute the regular carrying on of trade or business. Thus, the operation of a commercial parking lot on Saturday of each week would be the regular conduct of trade or business. Where income producing activities are of a kind normally undertaken by nonexempt commercial organizations only on a seasonal basis, the conduct of such activities by an exempt organization during a significant portion of the season ordinarily constitutes the regular conduct of trade or business. For example, the operation of a track for horse racing for several weeks of a year would be considered the regular conduct of trade or business because it is usual to carry on such trade or business only during a particular season.

(ii) *Intermittent activities; in general.* In determining whether or not intermittently conducted activities are regularly carried on, the manner of conduct of the activities must be compared with the manner in which commercial activities are normally pursued by non-exempt

provides an elaboration of the statute.[34] Subparagraph (1) sets forth the general rule that "regard must be had to the frequency and continuity with which the activities productive of the income are conducted and the manner in which they are pursued." This is immediately qualified by the statement that "This requirement must be applied in light of the purpose of the unrelated business income tax to place exempt organization business activities upon the same tax basis as the nonexempt business endeavors with which they compete."

Subparagraph (2) applies the principles of subparagraph (1) "in certain cases". Subparagraph (2) consists of three subdivisions. Subdivision (i) focuses on comparisons of time spans. If nonexempt organizations normally conduct such activities on a year-round basis, then (a) the activity is to be considered regularly carried on if the exempt organization conducts it on a year-round basis,[35] and (b) the activity is not to be considered regularly carried on if the exempt organization conducts it for only a few weeks each year. If

organizations. In general, exempt organization business activities which are engaged in only discontinuously or periodically will not be considered regularly carried on if they are conducted without the competitive and promotional efforts typical of commercial endeavors. For example, the publication of advertising in programs for sports events or music or drama performances will not ordinarily be deemed to be the regular carrying on of business. Similarly, where an organization sells certain types of goods or services to a particular class of persons in pursuance of its exempt functions or "primarily for the convenience" of such persons within the meaning of section 513(a)(2) (as, for example, the sale of books by a college bookstore to students or the sale of pharmaceutical supplies by a hospital pharmacy to patients of the hospital), casual sales in the course of such activity which do not qualify as related to the exempt function involved or as described in section 513(a)(2) will not be treated as regular. On the other hand, where the nonqualifying sales are not merely casual, but are systematically and consistently promoted and carried on by the organization, they meet the section 512 requirement of regularity.

(iii) *Intermittent activities; special rule in certain cases of infrequent conduct.* Certain intermittent income producing activities occur so infrequently that neither their recurrence nor the manner of their conduct will cause them to be regarded as trade or business regularly carried on. For example, income producing or fund raising activities lasting only a short period of time will not ordinarily be treated as regularly carried on if they recur only occasionally or sporadically. Furthermore, such activities will not be regarded as regularly carried on merely because they are conducted on an annually recurrent basis. Accordingly, income derived from the conduct of an annual dance or similar fund raising event for charity would not be income from trade or buisness regularly carried on.

[34]The "regularly carried on" requirement appears in sec. 512(a)(1). It is not clear why the Treasury Department chose to issue its interpretation of this language in a regulation under sec. 513. Notwithstanding this anomaly, we have looked to sec. 1.513-1(c), Income Tax Regs., as the authoritative regulations on this point. *Suffolk County Patrolmen's Association v. Commissioner*, 77 T.C. 1314, 1319-1323 (1981).

[35]The regulation specifies that "the conduct of year-round business activities for one day each week would constitute the regular carrying on of trade or business. Thus the operation of a commercial parking lot on Saturday of each week would be the regular conduct of trade or business."

nonexempt organizations normally conduct such activities on a seasonal basis, then the activity "ordinarily" is to be considered regularly carried on if the organization conducts it during a "substantial portion" of the season.

Subdivisions (ii) and (iii) deal with "intermittent" activities. The regulation does not, in terms, define "intermittent". We gather from the context that an activity is to be regarded as intermittent if it is not conducted by the tax-exempt organization on a year-round basis (or, with regard to an activity that is normally conducted by nonexempt organizations only on a seasonal basis, the activity is intermittent if it is not conducted by the tax-exempt organization for substantially the full season). Subdivision (ii) provides that "In general, exempt organization business activities which are engaged in only discontinuously or periodically will not be considered regularly carried on if they are conducted without the competitive and promotional efforts typical of commercial endeavors. * * * On the other hand, where the nonqualifying [i.e., under sec. 513(a)(2)] sales are not merely casual, but are systematically and consistently promoted and carried on by the organization, they meet the section 512 requirement of regularity." Subdivision (iii) provides that some activities "occur so infrequently that neither their recurrence nor the manner of their conduct will cause them to be regarded as trade or business regularly carried on."

Nonexempt organizations normally conduct greeting card sales business as on a year-round basis, but the Christmas card portion of their activities is on a seasonal basis. If we compare petitioner's Christmas card activities with the Christmas card activities of nonexempt organizations, then it is evident that, under the tests of section 1.513-1(c)(2)(i), Income Tax Regs., petitioner's activities "ordinarily" would be considered regularly carried on. If we compare petitioner's Christmas card activities with the full greeting card activities of nonexempt organizations, then petitioner's activities fall between the poles that are illustrated in subdivision (i); that is, petitioner's activities are substantially less extensive than the year-round activities of nonexempt organizations, but substantially more extensive

than the "few weeks" that would constitute a safe harbor for petitioner.

Under subdivision (ii), we have a similar uncertainty. In many respects petitioner's Christmas card activity was not conducted in the same manner that nonexempt organizations use in such activities. In particular, we note the following:

(1) No nonexempt commercial distributors of greeting cards distributed such cards only during the Christmas season; petitioner distributed only Christmas cards and did so only during the season for such cards. Thus, petitioner provided no competition to or interference with nonexempt distributors as to, e.g., Mother's Day cards, Father's Day cards, Easter cards, and Thanksgiving cards.

(2) Substantially all of the Christmas cards that petitioner distributed were sent to the recipients without prior (or simultaneous) orders or payments.[36] In contrast, nonexempt distributors who solicited by mail used the devices of catalogs and prior orders before sending out their greeting cards.

(3) Petitioner sent the Christmas cards under circumstances such that the recipients could keep and use the cards without being liable to pay for the cards. (However, it must be noted that recipients who failed to participate for 3 years in a row were removed from the lists.) In contrast, nonexempt organizations required payment before sending out the cards.

(4) Petitioner solicited only its members; it did not compete with nonexempt organizations for general public patronage.[37]

Thus, it may be that petitioner's Christmas card activity was "conducted without the * * * promotional efforts typical of commercial endeavors", within the test of subdivision (ii). On the other hand, it is clear that petitioner's Christmas card sales "are not merely casual, but are systematically and consistently promoted and carried on", and so appear

---

[36]A relatively small number of Christmas cards were sent in response to order forms included in the initial mailings. See table 1 *supra.*

[37]Although this element appears to be relevant in analyzing whether an activity is "regularly carried on" by the exempt organization, it appears not to be significant in determining whether the activity constitutes a trade or business. See *United States v. American Bar Endowment,* 477 U.S. 105, ___ (1986).

to "meet the section 512 requirement of regularity", within the test of subdivision (ii). Thus, subdivision (ii) gives us inconclusive guidance.

As to subdivision (iii), we conclude that petitioner's Christmas card activities did not "occur so infrequently" that that fact alone would warrant treating them as not having been regularly carried on. However, this merely means that petitioner fails to qualify for the safe haven that subdivision (iii) provides. This failure does not of itself lead us to decide in favor of respondent.

Petitioner relies on, and respondent distinguishes, our opinion in *Suffolk County Patrolmen's Association v. Commissioner, supra.* In that case, the organization presented and sponsored a professional vaudeville show 1 weekend per year for at least 6 consecutive years. Each year, the preparation time was 8 to 16 weeks. Most of the organization's income from this activity was derived from the sale of advertising in program guides that were distributed at the performances, with no distribution to the general public. A small portion of the income was derived from ticket sales. We held that the activity was not regularly carried on, relying on the similarity of the activity to the following two examples in the regulations (77 T.C. at 1321-1322):

For example, the publication of advertising in programs for sports events or music or drama performances will not ordinarily be deemed to be the regular carrying on of business. * * * [Sec. 1.513-1(c)(2)(ii), Income Tax Regs.]

Accordingly, income derived from the conduct of an annual dance or similar fund raising event for charity would not be income from trade or business regularly carried on. [Sec. 1.513-1(c)(2)(iii), Income Tax Regs.]

In the *Suffolk County* case, respondent relied on several revenue rulings. We pointed out that a "revenue ruling is merely respondent's interpretation of a section or regulation and is not binding upon us. *Edwards v. Commissioner*, 32 T.C. 751, 756 (1959)." 77 T.C. at 1324. We then discussed two of those rulings, which appeared to present factual settings similar to that of the *Suffolk County* case. In Rev. Rul. 73-424, 1973-2 C.B. 190, respondent ruled that an organization's distribution of an annual yearbook, containing editorial matter and advertising, to the organization's entire membership gave rise to unrelated business taxable

income. In Rev. Rul. 75-201, 1975-1 C.B. 164, respondent ruled that an organization's distribution of an annual concert book, which contained paid advertising, to patrons of an annual ball at the event itself, to raise funds for an exempt symphony orchestra did not give rise to unrelated business taxable income.

We analyzed the two rulings as follows in our *Suffolk County* opinion (77 T.C. at 1325):

> On the other hand, Rev. Rul. 73-424, *supra*, is substantially dissimilar from Rev. Rul. 75-201, *supra*, and the instant case. In light of the regulations and the legislative history of sections 511 through 513, wherein every example of an activity not considered regularly carried on concerns an event of some sort (sandwich stand, sports, drama or music event, dance, etc.), the fact that Rev. Rul. 73-424 presents no event to accompany its publication is no small variance. While we express no opinion as to the correctness of respondent's holding in that ruling, suffice to say that it is distinguishable from the case at bar.

Although the *Suffolk County* case has some similarities to the instant case, we conclude that it differs from the instant case in precisely those factors that our *Suffolk County* opinion stressed. The instant case is not like the illustrations in the regulations, dealing with (1) advertising in programs for sports events or music or drama performances, or (2) the conduct of an annual dance or similar fund raising event. The instant case is like Rev. Rul. 73-424 (and unlike Rev. Rul. 75-201) in that the instant case does not concern "an event of some sort (sandwich stand, sports, drama or music event, dance, etc.)". Accordingly, we conclude that the expressed rationale in our opinion in *Suffolk County* serves to undermine petitioner's case rather than support it.

Since none of the subdivisions of subparagraph (2) of section 1.513-1(c), Income Tax Regs., clearly requires a specific answer in the instant case, we return to subparagraph (1), which directs us to apply the general rule (relating to frequency, continuity, and manner) "in light of the purpose of the unrelated business income tax to place exempt organization business activities upon the same tax basis as the nonexempt business endeavors with which they compete."

The "regularly carried on" requirement dates back to the 1950 legislation which enacted the unrelated business income tax. The requirement appeared in the opening flush language of section 422(a) of the Internal Revenue Code of 1939. The legislative history includes the following comment (S. Rept. 2375, 81st Cong., 2d Sess., at 30 (1950), 1950-2 C.B. 483, 505, to accompany H.R. 8920, the Revenue Act of 1950) as to the purpose of this requirement:

> In order to eliminate the cases in which the unrelated business income is incidental, both the House bill and your committee's bill include a specific exemption of $1,000. This, in addition to the requirement that such businesses must be carried on "regularly" to be taxable, will dispose of most of the nuisance cases. Moreover, imposition of the tax in cases where the income is below $1,000 would involve excessive costs of collection and payment.

The House report (H. Rept. 2319, 81st Cong., 2d Sess., at 37 (1950), 1950-2 C.B. 380, 409) provides almost exactly the same explanation.

In the instant case, petitioner each year attempts to sell Christmas cards to some 50,000 of its members. It has established an elaborate mechanism for targeting its activities and for keeping current the list of targeted members. In 1974, 1975, and 1976, petitioner's Christmas card activity, together with similar activity by other tax-exempt organizations, constituted a significant portion of the total Christmas card market. About 13 percent of greeting cards are distributed by direct marketing or mail including tax-exempt organizations. Lipschutz' sole clientele was "nonprofit" tax-exempt organizations, and a major portion of Lipschutz' business involved Christmas card programs like the one petitioner conducted. During 1974, 1975, and 1976, Lipschutz' share of the Christmas card market was 1.52 percent, 1.84 percent, and 2.12 percent, respectively.

Petitioner's profits from the Christmas cards program are not "incidental"; petitioner's financial statements indicate (table 2 *supra*) that this program grew substantially during the years before the Court and, by the last of these years, it had become petitioner's second largest source of revenue. The program's consistency, size, purposefulness, and impact on competition lead us to conclude that this is not one of

the "nuisance cases" that the Congress sought to eliminate from the unrelated business income tax.

Although the matter is not free from doubt, we conclude that petitioner's Christmas card activities during the years in issue were more like those which the regulations treat as "regularly carried on", than they were like those which the regulations treat as not being regularly carried on. We conclude that this result is consistent with the Congress' purpose. We conclude that petitioner's activities were regularly carried on by it, within the meaning of section 512(a)(1).

We hold for respondent on this issue.

## III. *Substantially Related*

Under sections 512(a)(1) and 513(a), even if an exempt organization regularly carries on a trade or business, the income therefrom is not subject to the unrelated business income tax if the trade or business is "substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501" (sec. 513(a)).

Petitioner contends that its "utilization of Christmas cards as a premium is an item which enhances the good feelings of members." Thus, petitioner contends, the Christmas card program "is substantially related to the Petitioner's exempt purpose of promoting comradeship amongst Petitioner's members."

Respondent, relying on section 1.513-1(d)(2), Income Tax Regs.,[38] argues that whether we view petitioner as being an

---

[38]Sec. 1.513-1. Definition of unrelated trade or business.

(d) *Substantially related.*—* * *

(2) *Type of relationship required.* Trade or business is "related" to exempt purposes, in the relevant sense, only where the conduct of the business activities has causal relationship to the achievement of exempt purposes (other than through the production of income); and it is "substantially related," for purposes of section 513, only if the causal relationship is a substantial one. Thus, for the conduct of trade or business from which a particular amount of gross income is derived to be substantially related to purposes for which exemption is granted, the production or distribution of the goods or the performance of the services from which the gross income is derived must contribute importantly to the accomplishment of those purposes. Where the production or distribution of the goods or the performance of the services does not contribute importantly to the accomplishment of the exempt purposes of an organization, the income from the sale of the goods or the performance of the services does not derive from the

exempt organization under section 501(c)(4) (relating to social welfare organizations, etc.) or section 501(c)(19) (relating to veterans' organizations), the Christmas card program bears no causal relationship to the advancement of the exempt purposes of the organization.

We agree with respondent.

We have concluded, and we have found, that petitioner's Christmas card program was in substance the sale of goods. We have concluded, and we have found, that petitioner conducted the Christmas card program with the predominant intent of producing income. In applying the "substantially related" test to the Christmas card program, we are to focus on the manner of petitioner's operation of the program, and not on the benefits to petitioner's members. *United States v. American College of Physicians*, 475 U.S. at 848-849; *Shiloh Youth Revival Centers v. Commissioner*, 88 T.C. 565, 575-576 (1987).

Petitioner chose to use a marketing device that involved sending goods to prospective purchasers without requiring orders or payment in advance. We may speculate that the "good feelings" of those of petitioner's members who received the Christmas cards were "enhanced". On the basis of the record in the instant case, we conclude that the manner in which petitioner operated its program was a "straight-forward marketing" device used primarily to increase profits on sales and not primarily to enhance good feelings. See *Florida Trucking Association v. Commissioner*, 87 T.C. 1039, 1045 (1986).

We do not believe it is helpful, in resolving the instant case, to engage in an analysis of the circumstances in which enhancing the good feelings of an organization's members can be a "purpose or function constituting the basis for [the organization's] exemption under section 501". (Sec. 513(a).) It suffices to conclude that, in the instant case, we do not believe that the Christmas card program contributed importantly to that purpose, other than by producing income for petitioner.

---

conduct of related trade or business. Whether activities productive of gross income contribute importantly to the accomplishment of any purpose for which an organization is granted exemption depends in each case upon the facts and circumstances involved.

We hold for respondent on this issue.

### IV. *Voluntary Dues*

Petitioner contends that (1) substance controls over form, (2) the Christmas card program served to keep the dues lower than they otherwise would be, (3) the Christmas card program amounted to "a means of requesting additional voluntary dues from the members" and, (4) such voluntary dues are not subject to the unrelated business income tax.

Respondent agrees that substance controls over form, but notes "that courts rarely permit a taxpayer to deny the form of his own transactions." Respondent argues that "the term voluntary dues is somewhat a contradiction in terms." Respondent asserts that petitioner's decision-making and record-keeping procedures for dues were different from those employed for receipts from the Christmas card program. Respondent concludes that petitioner's dues arguments are not a justification for excluding petitioner's Christmas card program receipts from the unrelated business income tax.

We agree with respondent's conclusion.

The unrelated business income tax applies or not, depending on the source of the organization's receipts. With exceptions not here relevant (see, e.g., paragraphs (3) and (4) of sec. 512(a)), the use to which the organization puts its revenues does not affect the inclusion of the revenues in unrelated business income. See, e.g., *United States v. American College of Physicians*, 475 U.S. at 838. Accordingly, it does not matter whether petitioner's receipts from the Christmas card program were used to reduce dues, or to delay an increase in dues, or for any of the charitable or other activities that petitioner conducted.

If petitioner had acquired the funds by raising dues, the unrelated business income tax would not apply. Petitioner chose to acquire its funds by regularly carrying on an unrelated trade or business and so the unrelated business income tax does apply.

We hold for respondent on this issue.

### V. *Gross Income*

Section 512(a)(1) provides that "the term 'unrelated business taxable income' means the gross income derived by

any organization from any unrelated trade or business * * * , less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business." Therefore, in order for an organization to have "unrelated business taxable income", it must have "gross income derived * * * from any unrelated trade or business."

Section 61(a) provides that "except as otherwise provided in this subtitle [subtitle A, relating to income taxes], gross income means income from whatever source derived". Section 102(a),[39] which is in subtitle A, provides that gifts are excluded from gross income. Consequently, if a receipt of property is properly considered a "gift", it is not includable in "gross income". *Commissioner v. Duberstein*, 363 U.S. 278, 284 (1960); *Estate of McAdow v. Commissioner*, 12 T.C. 311, 316 (1949). See *Parrott v. Commissioner*, 1 B.T.A. 1 (1924). It follows that if the receipt is not "gross income", then it is not a part of "unrelated business taxable income" as defined in section 512(a)(1).

In *United States v. American Bar Endowment*, 477 U.S. at ___, the Supreme Court endorsed the two-part test of Rev. Rul. 67-246, 1967-2 C.B. 104, for determining how much of a dual payment transaction constitutes a gift. As the Supreme Court noted, the Tax Court has adopted the same approach in *Murphy v. Commissioner*, 54 T.C. 249, 254 (1970).[40]

Under this approach, firstly, the payment can be a gift only to the extent it exceeds the fair market value of the benefit received. Secondly, the portion of the payment that passes the first test is a gift only to the extent it was paid with the intention of making a gift. E.g., *Considine v. Commissioner*, 74 T.C. 955, 968-969 (1980).

Petitioner contends that each payor made a gift (excludable from petitioner's income) to the extent of the excess of (a) the amount that person paid over (b) the fair market value of the box of Christmas cards that person received.

---

[39]SEC. 102. GIFTS AND INHERITANCES.

(a) GENERAL RULE.—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.

[40]*Murphy v. Commissioner*, 54 T.C. 249, 254 (1970), and Rev. Rul. 67-246, 1967-2 C.B. 104, deal with gifts in the context of charitable contribution deductions under sec. 170. The same tests apply in determining whether an amount is excludable from income as a gift under sec. 102. See *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C. 497, 602 n. 114 (1980).

Petitioner asserts that the fair market value per box was $1.45 for the 1974 program, $1.59 for the 1975 program, and $1.77 for the 1976 program. Respondent concedes that such an excess is excludable, but only to the extent that the recipient of a box paid more than $5. Respondent points to the fair market value testimony of his expert witness ($3 to $5 per box), to the Lipschutz assurances that the Christmas cards it would supply would be worth $7 to $9 per box, and to the indications on the Christmas cards themselves that they were to list for $0.50 each. (Since each box contained 20 cards, this means that the cards in each box listed for an aggregate of $10.) Petitioner stresses the poor quality of the cards[41]—"rudimentary folding; inexpensive paper stock; inferior embossing"—as justification for its contention that the boxes of Christmas cards were worth less than the amounts petitioner asked its members to pay.

Petitioner has the burden of proof as to fair market value and motive of the payors. *Welch v. Helvering, supra*; *Hornung v. Commissioner*, 47 T.C. 428, 438-439 (1967).

The Christmas cards were generally paid for by people who used them for mailing to friends and relatives and who acquired them one box at a time. We conclude that the relevant market for determining fair market value is retail or direct (rather than, e.g., wholesale or job-lot) sales by the box (rather than, e.g., individual cards). See *Anselmo v. Commissioner*, 80 T.C. 872 (1983), affd. 757 F.2d 1208 (11th Cir. 1985).

In addition to the testimony of the parties' expert witnesses, which in the instant case sets the parameters of possible fair market values, we have information about the "contributions" that petitioner requested, petitioner's offer to send additional boxes at the same price, and petitioner's membership's response to petitioner's requests and offers.

As table 1, *supra*, indicates, substantially all the payments were in precisely the amount of petitioner's requests. This may mean that most of those responding thought that they were getting bargains (i.e., that the boxes had greater fair market values). However, if this were so, then we would expect to see substantial numbers of people ordering

---

[41]Petitioner does not suggest that it contemplated suing Lipschutz for breaching its contract by failing to provide cards that were worth $7 to $9 per box.

additional boxes at the requested price. Table 1 shows that, of the boxes to which members responded (i.e., total boxes shipped, less "no participation" boxes), for taxable years 1975 and 1977, about 4 percent consisted of additional orders; for 1976 (the year in which the requested amount was increased from $2 to $3), about 2 percent. This low additional order rate suggests that the fair market values did not significantly exceed the requested amounts.

On the other hand, the fact that substantially all the payments precisely matched petitioner's requests may mean that most of those who participated were motivated by charitable considerations to pay more than fair market value. However, if this were so, we would not expect orders for additional boxes at the requested price. It would be simpler to make any additional contributions by sending a larger check for the first box rather than go through the trouble of sending additional orders and having to wait for the additional, hypothetically overpriced, cards to arrive. Thus, the fact that some members took the trouble to go through the reorder process suggests that the fair market values were not significantly less than the requested amounts.

We cannot set fair market values with a high degree of confidence that our conclusions are precisely correct. However, we believe that the record in the instant case warrants our conclusion that the fair market values approximate the requested amounts. Thus, we conclude, and we have found, that the Christmas cards for taxable year 1975 had a fair market value of $2 per box; for 1976 and 1977, $3 per box. We conclude, and we have found, that those who paid more than these amounts intended to make gifts of the excesses to petitioner.

We hold that, for any year, amounts paid in excess of the amounts petitioner requested for that year are excludable from petitioner's gross income from its unrelated trade or business for that year.

## Summary

As a result of the foregoing, we hold, for respondent, that much of petitioner's receipts from its Christmas card program is subject to the unrelated business income tax for

taxable years 1975, 1976, and 1977. Because we hold that some of those receipts are not includable in petitioner's gross income, and because of concessions by respondent (referred to in the text preceding table 3 *supra*),

*Decision will be entered under Rule 155.*